469 So.2d 1177 (1985)
The LAND AND OFFSHORE COMPANY, Plaintiff-Appellee,
v.
James MARTIN, et al., Defendants-Appellants.
No. 84-418.
Court of Appeal of Louisiana, Third Circuit.
May 15, 1985.
*1179 Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, John G. Torian, II, Lafayette, Edwards, Stefanski and Barousse, Russell K. Zaunbrecher, Crowley, for defendant-appellant.
Perrin, Landry, deLaunay and Durand by Gerald C. deLaunay, Lafayette, for plaintiff-appellee.
Mouton, Roy, Carmouche, Bivins, Judice & Henke, John A. Bivins, Lafayette, for defendant-appellee.
D. Rex English, Lafayette, for defendant-appellee-appellant.
Before GUIDRY, FORET and KNOLL, JJ.
FORET, Judge.
This is a suit for breach of contractual warranties and obligations. Pursuant to the sale of their stock in The Land and Offshore Company to plaintiff, LOC, defendants, F.W. Chapman, III; H.C. Harris, Jr.; James H. Martin; and Percy Lormand, Sr., executed written agreements on August 25, 1981 and September 11, 1981. In these agreements, defendants undertook certain obligations, extended a number of contractual warranties to LOC, and agreed to indemnify LOC for certain losses including losses from the breach of the contractual warranties. Plaintiff filed suit alleging that defendants had breached a number of these warranties and had failed to indemnify it. Trial was originally set for August 17, 1983, but was not held. F.W. Chapman, III, the only defendant present on that day, entered into an agreement with plaintiff that he would stipulate that he was liable to plaintiff for $750,000. Subsequently, the other defendants filed exceptions of no cause of action claiming that the agreement between plaintiff and defendant, Chapman, was a settlement and that, as obligors in solido with Chapman, they had been released. The trial court overruled these exceptions. After trial on the merits, the trial court found that the defendants had breached a number of contractual warranties and rendered judgment for plaintiff in the amount of $1,146,785.60. Defendants appealed and plaintiff answered the appeal.
This appeal presents us with a number of issues:
(1) Was the agreement between plaintiff and defendant, Chapman, by which Chapman agreed to stipulate that he was liable for a certain amount a settlement or compromise which effected a release of Chapman's co-obligors?
(2) Did the court err when it allowed the introduction of parol evidence?
(3) Did the trial court err in finding that defendants had breached a number of contractual obligations and warranties?

*1180 (4) Was it proper for the trial court to grant special damages in excess of the amount prayed for by plaintiff?
(5) Did the trial court err either in awarding interest to plaintiff or in limiting its award by granting only post-judgment interest?

FACTS
Defendants, F.W. Chapman, III; H.C. Harris, Jr.; James H. Martin; and Percy Lormand, Sr., were all stockholders of The Land and Offshore Company. During the first part of 1981, the company was losing a considerable amount of money (more than $450,000 from January 1, 1981, to June 30, 1981). A $4,000,000 loan was coming due, and defendants, concerned about personal liability and corporate bankruptcy, were eager to sell the company. After one attempt to sell the company fell through, defendants contacted the "Platt Group" which consisted of George Platt, Robert Gist, and Roland Perrin. In a series of hurried negotiations, defendants and the Platt Group reached an agreement on the sale of the company. It was agreed that defendants would sell their stock to LOC, a corporation owned by the members of the Platt Group. The agreement between plaintiff corporation and defendants was set forth in a series of documents that were executed on August 25, 1981, and September 11, 1981. As part of the sale agreement, defendants extended a number of warranties and undertook a number of obligations.
Article 2.3 of the sale agreement contained perhaps the most general warranty extended by defendants. In Article 2.3 defendants warranted that there were "no fixed or contingent liabilities ... of Company (Land and Offshore Company) as of the date of (the) Company's Latest Balance Sheet other than those reflected on either the Company's Latest Balance Sheet, the notes thereto or in this Agreement, or in one or more of the Exhibits to this Agreement." Defendants also warranted that an insurance loss fund maintained with Gray and Company would be fully funded as of the September 11, 1981 closing date (Art. 2.15 of the agreement). Additionally, defendants warranted that a portion of their accounts receivable was collectible and promised to pay any amounts not collected within ninety days through the use of reasonable efforts. Defendants agreed to indemnify plaintiff for a number of claims which were pending against the company prior to the closing date and agreed to give plaintiff irrevocable letters of credit to secure these obligations (indemnity agreement). Defendants also agreed to purchase certain assets from LOC including an airplane and an office building located in Gueydan, Louisiana.
The lower court found that the defendants had made the assets of The Land and Offshore Company look much better than the actual financial condition of the company at the time of the sale, and that, consequently, defendants had violated a number of their contractual warranties. The court also found that LOC was entitled to indemnification for the money it had paid on a number of the claims pending against Land and Offshore at the time of the sale. The court also ordered defendants to buy the airplane and office building in Gueydan and to indemnify plaintiff for interest paid on the financing of the office building. In all, the court awarded plaintiff a total of $1,146,758.60.

AGREEMENT TO ENTER STIPULATION
The trial court denied the exceptions of no cause of action in which defendants, Harris, Martin, and Lormand, had urged that they had been released by plaintiff's failure to reserve its rights against them in the agreement entered into by plaintiff with defendant, F.W. Chapman, III. The court held that the agreement was not a settlement or compromise as contended by the defendants, but a confession of judgment.
We agree with the trial court that the stipulation entered into by Chapman was not a settlement or compromise. The agreement provided, in pertinent part:

*1181 "That at the trial of this matter it will be stipulated by the same F.W. Chapman, III, that the sum of Seven Hundred and Fifty Thousand ($750,000) Dollars will be taken as proven by the plaintiffs as against the said F.W. Chapman, III."
The agreement further provided:
"That a judgment will be signed as to said amount after October 3, 1983, and not prior thereto, and made executory at said time."
LSA-C.C. Article 2203[1] provides that the remission or conventional discharge in favor of one of the debtors in solido, discharges all the others, unless the creditor has expressly reserved his right against the latter. The agreement entered into by Chapman and plaintiff was neither a remission nor a conventional discharge. It did not release or discharge Chapman. It only provided that at the trial a stipulation would be entered that the sum of $750,000 would be taken as proven against Chapman. Furthermore, at one point in the agreement, this sum is referred to as only a minimum amount. Since this agreement did not operate to discharge or in any way release defendant, Chapman, the other obligors were not released.

PAROL EVIDENCE
Defendant stockholders contend that the trial court erred when it allowed parol evidence. Although LSA-C.C. Art. 2276 prohibits parol evidence "against or beyond" what is contained in a written act, this prohibition has not been interpreted by our courts as an absolute prohibition against parol evidence in a suit on a written contract.
One exception to the parol evidence rule allows the admission of parol evidence to show fraud, misrepresentation, or error. Gulf States Finance Corporation v. Airline Auto Sales, Inc., 248 La. 591, 181 So.2d 36 (1965); Mitchell v. Clark, 448 So.2d 681 (La.1984). Plaintiff alleged in its petition that certain misrepresentations were made by defendant stockholders. These misrepresentations included the listing of certain equipment on the books of the company that were not in the possession of the company at the time of the closing and that the defendant stockholders failed to reveal certain lawsuits which were pending against The Land and Offshore Company. These allegations were sufficient to allege fraud, misrepresentation, or, at the very least, mutual error. See Shapar, Inc. v. Cliff's Wholesale Pizza Products, Inc., 428 So.2d 1033 (La.App. 1 Cir. 1983).
In interpreting contractual provisions about which there exists some doubt, a court must seek the true intention of the parties, even if to do so necessitates a departure from the literal meaning of the terms of the agreement. Monsur v. Chaddick, 274 So.2d 499 (La.App. 3 Cir.1973). There existed some doubt as to the meaning of several of the stipulations of the contract, and parol evidence was admissible to explore the true intentions of the parties in this regard. Although we agree with defendant stockholders that in large part the contract spoke for itself, unfortunately for defendants, in most cases what the clear language of the contract showed was that defendants had breached their contractual obligations.

BREACHES OF DEFENDANTS' CONTRACTUAL OBLIGATIONS
We will proceed with a detailed consideration of the obligations breached by defendants. For this purpose, we will take the liberty of quoting from the trial judge's excellent written reasons for judgment:

"I. The Gueydan Office Building

On November 11, 1983, the defendants stipulated to their obligation of purchasing the Gueydan Office Building. It *1182 has come to the Court's attention that the defendants will not comply with this agreement unless the plaintiff waives its right to interest and additionally, agrees to pay Eight Hundred Thirty Five and 62/100 Dollars ($835.62) for taxes assessed against the property for 1983. These conditions imposed are in direct opposition with the stated purpose of the defendants assuming responsibility for this purchase. The Agreement to Purchase specifically stated that one reason for selling certain assets to the defendants was to be "relieved of the expenses of upkeep and maintenance of the assets". Although interest on the office building was not specifically enumerated in the plaintiff's prayer, paragraph 29 of the petition alluded to this claim sufficiently to put the defendants on notice. Therefore, the Court orders the defendants to purchase the building at One Hundred Eighty Three Thousand and No/100 Dollars ($183,000.00) and to indemnify plaintiff for the interest payments on the financing of the building at 13.5 percent (13.5%) per annum, beginning December 10, 1981.

* * *

"II. Airplane Financing

Pursuant to the "Agreement to Purchase", the defendants assumed responsibility for interest due under the note and Security Agreement on the aircraft for the period commencing with the closing date of September 11, 1981. The evidence presented and the testimony of Wayne Hall has shown, however, that the plaintiff paid the interest without first making demand upon the defendants. In addition, as evidenced by defendants "Exhibit 8", the plaintiffs appeared to make no claim for the interest paid on the airplane until this suit was filed. For these reasons, the Court finds that the plaintiff has waived its claim for reimbursement of the Ten Thousand Three Hundred Fifteen and No/100 Dollars ($10,315.00) paid in interest.

"III. Missing Equipment

Land and Offshore has alleged that certain equipment warranted to be in existence in the Stock Purchase Agreement was not actually in the company's possession at the time of closing. The defendants stipulated at trial that they were responsible for three Miller gas welders, totaling in value of Eighteen Thousand Five Hundred Eighty Two and 50/100 Dollars ($18,582.50). As for the balance of this claim, the plaintiff has relied heavily on a list of missing equipment prepared by Wayne Hall. The Court feels that Claude Sirmon, the man who actually conducted the survey of Land and Offshore's equipment, should have testified as to the veracity of plaintiff's "Exhibit 24", the list that Hall prepared from information supplied to him by Sirmon. However, Roland Perrin did testify at trial that upon his personal inspection immediately after the sale of Land and Offshore, certain items were missing which were of such a nature that had they been present, he would have remembered them. Based upon the stipulation,[2] the testimony of Perrin and the list prepared, labeled as plaintiff's "Exhibit 25", the Court finds the defendants responsible for the following missing equipment:

White Fork Lift #202D1042 $ 3,172.00
Buda-Lanoro Diesel Power Plant #52331 1,400.00 *
Midland Harrow 976.00
14A-SR2 Pump Engine #243052A26 2,000.00
20KW Generator W/271 Engine 1,500.00
VM Air Cooled Diesel Engine #1000S 1,500.00
Dutz W/4" Pump #5618361 3,500.00
Generator 30KW W/271 GM 4,800.00
Miller Gas Welder #902536 5,028.00
Miller Gas Welder #900955 5,918.97
Miller Gas Welder #901802 7,635.08
 __________
 TOTAL $37,430.50

* Note: The Buda-Lanoro had a book value of $1,400.00 rather than $4,500.00.

"IV. Accounts Receivable

Based on the provisions of Article 2.17 of the Stock Purchase Agreement, Land and Offshore claims reimbursement for receivables which have been uncollectible. The testimony relating to this issue and the exhibits forwarded by both sides have been inconsistent; however, the Court feels that Wayne Hall's testimony at trial, *1183 especially pursuant to defendant's "Exhibit 7A-C", has established the correct amount to which plaintiff is entitled.
"The defendant's exhibit, referred to above, was prepared by Ollie Sonnier, and as testified by Mr. Hall, has been maintained in Land and Offshore's company records since March 22, 1982. This exhibit reflected a balance of Thirty One Thousand Three Hundred Forty Six and 17/100 Dollars ($31,346.17) as being owed to Land and Offshore. Since the time of preparation, Twenty Two Thousand and No/100 Dollars ($22,000.00) was received in settlement of a bad debt with Howell Petroleum. This leaves a balance of Nine Thousand Three Hundred Forty Six and 17/100 Dollars ($9,346.17), which the Court orders the defendants to indemnify plaintiff.

"V. American Mutual Insurance Claim

Since the closing date of September 11, 1981, the Land and Offshore Company has incurred Two Hundred Ninety Nine Thousand Seven Hundred Fifty Four and No/100 Dollars ($299,754.00) in American Mutual Insurance Company premium charges for which the plaintiff is now demending [sic] indemnity. The Court feels that parole evidence is unnecessary in resolving this dispute, as the documents agreed upon by both of the purchasers and sellers speak for themselves.
"Article 2.3 of the Stock Purchase Agreement warranted that there were "no fixed or contingent liabilities ... other than those reflected on either the company's latest blanace [sic] sheet, the notes thereto or in this agreement, or in one or more of the exhibits to this agreement." The Indemnity Agreement, referred to as L-3 in Article 6.15 of the Purchase Agreement, was incorporated into the closing documents with the intended purpose of disclosing the future liabilities of the company arising from preclosing date occurrences. The defendants agreed to indemnify the company against net losses in excess of Two Hundred Eighty Nine Thousand Five Hundred and No/100 Dollars ($289,500.00) which represented the insurance reserves held with American Mutual Insurance Company to cover four (4) pending claims against Land and Offshore. The four enumerated claims were listed as those by Claude Boudreaux, Daniel Griffin, Olin Lirette and Roy Youngblood.
"The billings and computations provided by American Mutual Insurance Company show that the Indemnity Agreement erroneously represented that the claims of Arthur Campbell, Robert Allen Guidry, Andrew Thrash and Claude Williams were 100% covered by insurance (See Page 1 of Exhibit E). In addition, the claims of Lorence Reaux, Garland Monceaux and Frank Lemoine were, mistakenly or not, never disclosed to the plaintiff. The Court has noted defendants claim that the purchasers of Land and Offshore were aware of this contingent liability to American Mutual; specifically defendants have argued that "Exhibit K," the June 30, 1981 Balance Sheet, reflected this liability under the section entitled "Accrued Insurance". However, the Court has determined that this segment of the balance sheet referred to a settlement with American Mutual which was totally unrelated to the above enumerated claims against Land and Offshore. For this reason, the Court finds that plaintiff was not put on notice of any future liability except with respect to monthly installments due in payment of the settlement with American Mutual.
"Therefore, pursuant to Article 8.1 of the Stock Purchase Agreement, which warranted against any inaccurate representations by the selling shareholders of Land and Offshore, the Court orders the defendants to indemnify the plaintiff for the sum of Two Hundred Ninety Nine Thousand Seven Hundred Fifty Four and No/100 Dollars ($299,754.00), the amount billed by American Mutual to date for claims arising from pre-closing occurrences.

* * *

"VI. Gray and Company Loss Fund

The June 30, 1981 Balance Sheet listed as an asset entitled "Insurance Fund Deposit" the sum of Three Hundred Ninety Nine Thousand One Hundred Seventy *1184 Eight and No/100 Dollars ($399,178.00), which represented uncommitted funds remaining in the Gray and Company Loss Fund. This money has been reclaimed by Gray and Company to increase reserves for claims pending against Land and Offshore, which arose from pre-closing occurrences. Plaintiff's first claim in connection with this insurance plan is for indemnity of the loss of this asset; they rely upon the warranty provisions of Article 2.3 and 2.15 of the Stock Purchase Agreement.
"The Court has observed nothing contained in the Stock Purchase Agreement, the Balance Sheet, or any of the closing documents which would serve to put the purchasers on notice of the potential offset of this asset. While parole evidence may not be used to change the terms of a written agreement, it is admissable for the limited purpose of ascertaining the parties' intent at the time a contract was prepared, if the terms are ambiguous. From the totality of the evidence and the testimony heard at trial, the Court finds that the defendants intended to assume responsibility for any liabilities arising from pre-closing occurrences which would offset the assets represented to be found within the company.
"Since the asset designated as the "Insurance Fund Deposit" has been diminished as a result of claims arising from pre-closing date occurrences, the Court finds that the warranty provisions of Article 2.3 and 2.15 have been violated. Therefore, pursuant to the guarantee found within Article 8.1 of the Stock Purchase Agreement, the Court orders the defendants to indemnify plaintiff for the sum of Three Hundred Ninety Nine Thousand One Hundred Seventy Eight and No/100 Dollars ($399,178.00).
"Plaintiffs second claim relevant to this insurance plan is for reimbursement of One Hundred Twenty Three Thousand One Hundred Eighty Seven and No/100 Dollars ($123,187.00) paid to Gray and Company; this sum represents the amount due for the July and August contributions under the plan. The defendants have claimed they have no further obligation under this plan, since payments were made on a monthly basis in the regular course of business, up through the date of closing. Additionally, defendants aver that the only warranty under Article 2.15 of the Stock Purchase Agreement was that the loss fund would be sufficient to cover all uninsured claims. The Court finds no merit in this argument. Article 2.15 specifically warranted "that the said loss fund will be fully funded at closing, will be sufficient to cover all uninsured liability claims made on account of events occurring prior to closing date and that the only additional contributions to be made ... will be made through regular monthly premiums."
"Since the contributions to the Gray and Company plan were based upon payroll computations from the previous months, the Court interprets the "fully funded" requirement of Article 2.15 to mean that the loss fund's July and August billings would be paid by the defendants. Therefore, the Court orders that Land and Offshore be reimbursed the One Hundred Twenty Three Thousand One Hundred Eighty Seven and No/100 Dollars ($123,187.00) paid to Gray and Company.

"VII. Uninsured Indemnity Claims

"A. The Rentalease Claim

Land and Offshore claims the sum of Eight Thousand Four Hundred Twenty and No/100 Dollars ($8,420.00) as the balance due from settlement of the Rentalease Company claims. Pursuant to the Indemnity Agreement of September 11, 1981. The defendants provided an irrevocable letter of credit to the plaintiff to cover this potential liability. The Court has determined that the plaintiff chose, for its own business purposes, not to draw upon the letter of credit.[3] For this reason, the Court feels *1185 that the plaintiff may not now make this claim for restitution from the defendants. Therefore, the Court denies the relief requested on the Rentalease claim.

"B. Oil, Incorporated

"Plaintiff has paid Fifteen Thousand and No/100 Dollars ($15,000.00) in final settlement with Oil, Incorporated. Pursuant to the Indemnity Agreement in which the defendants agreed to indemnify plaintiff against "net losses" incurred by it on account of final settlement of any claim listed in that exhibit, the Court orders defendants to pay the amount of Fifteen Thousand and No/100 Dollars ($15,000.00) to Land and Offshore.

"C. Chauvin Construction Company and North Belt Suit

"Since these two claims have not yet resulted in final judgment or settlement, the Court is unable to determine the amount of indemnity due the plaintiff at this time. However, as the Indemnity Agreement specifically recognizes the defendants' obligation to indemnify plaintiff in regard to these two claims, the Court orders that payment of the amounts due upon final judgment or settlement of these claims be made executory in favor of the Land and Offshore Company."

SPECIAL DAMAGES
Defendants contend that the trial court erred in awarding special damages in an amount greater than that prayed for by plaintiff. In its first supplemental petition, plaintiff prayed for damages totaling $988,341.70. In its judgment, the trial court awarded plaintiff a total of $1,146,785.60. In the brief submitted on behalf of one of the defendants, this Court's attention is called to certain discrepancies between the damages as itemized by plaintiff in its first supplemental petition and as awarded by the trial court. It is pointed out that no amount was itemized as being due for interest on the Gueydan office building, but that the trial court awarded $49,410 for that element of damages; that $407,431.66 was prayed for in insurance claims but the trial court awarded $698,932; and that although $25,000 was prayed for in costs and attorney's fees, the trial court awarded $30,479.29. At the outset, we note that a trial court can award special damages even though they are not prayed for, Johnson v. Fuselier, 302 So.2d 721 (La.App. 3 Cir.1974), and may award such damages in excess of that prayed for. Cambrice v. Fern Supply Co., Inc., 285 So.2d 863 (La.App. 4 Cir.1973). Furthermore, the record supports the trial court's award of each of these elements of special damages. Evidence with regard to these amounts of damages was presented without any objection on the grounds that it was beyond the pleadings. The reception of this evidence without objection resulted in an enlargement of the pleadings.
Although the interest for the office building in Gueydan was not itemized in plaintiff's petition, as pointed out earlier, paragraph 29 of that petition alluded to that claim for interest and was sufficient to put defendants on notice. Moreover, the evidence as to the interest paid on that building was introduced by way of the deposition of Richard J. Rome. This deposition was introduced as a joint exhibit by plaintiff and defendants. Once again, the introduction of this evidence resulted in an enlargement of the pleadings.

POST-JUDGMENT INTEREST
Although plaintiff failed to pray for interest on the amount due either in its original *1186 petition or its first supplemental petition, it did pray for interest in a second amended petition filed after the trial but before the rendition of judgment. The trial court gave its leave to plaintiff to file this amended petition. Although plaintiff prayed for interest from the date the sums were due or, alternatively, from the date of judicial demand, the trial court declined to award pre-judgment interest feeling that, given the lateness of plaintiff's amendment, it would be prejudicial to defendants. It did, however, award post-judgment interest.
It has been held that a petition may be amended to ask for legal interest after a case has been submitted for a decision. Lotz v. Hurwitz, 174 La. 638, 141 So.83 (La.1932). The trial court's decision to allow plaintiff to amend its petition to ask for interest was proper.
Once having given leave of court to plaintiff to amend its petition, however, the court should not have limited the interest to post-judgment interest. All sums due on a contract bear interest at least from the time of judicial demand. See Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978). As the court said in Alexander:
"The decisions involving interest on sums recovered by suit are naturally myriad and because of their great number, if for no other reason, inconsistent. There is, however, a thread of consistency among the cases. Article 554 of the Louisiana Code of Practice of 1825 provided that interest should not run on accounts or unliquidated claims, but was repealed by La.Acts 1839, No. 53 § 1. This Court once commented,
"We have uniformly held that, since the passage of that act, all sums due on contracts bear interest from judicial demand, even where none has been stipulated, and the demand is unliquidated." Sullivan v. Williams, 2 La. Ann. 876, 878 (1847).
See also Petrie v. Wofford, 3 La.Ann. 562 (1848); Calhoun v. Louisiana Materials Co., 206 So.2d 147, 151-52 (4th Cir. 1968), writ denied, 251 La. 1050, 208 So.2d 324 (1968); Friede v. Myles Salt Co., 177 So. 105, 108 (Orl.La.App.1937)."
Therefore, the trial court should have awarded judicial interest from the date of judicial demand.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed, except that it is amended to provide that legal interest on the sum of $900,392.37[4] is due from the date of judicial demand.
All costs of this appeal are assessed against defendants.
AFFIRMED, AS AMENDED.
NOTES
[1] This case arose before the effective date of the revision of Title III and IV of Book III of Louisiana Civil Code. Now Article 1803 provides that remission of a debt in favor of one obligor does not extinguish the solidary obligation but only reduces it in proportion to the released obligor's portion of the debt.
[2] Defendants stipulated that three Miller gas welders were not transferred to LOC although they were included in the inventory attached to the agreement.
[3] Testimony indicated that when defendant Chapman was informed of plaintiff's claim for indemnity with regard to the rentalease loss, he, that is Chapman, told plaintiff to cash the letter of credit that defendants had provided as security but informed plaintiff that the defendants would seek to recover the money paid by suing Chevron Oil Company. Plaintiff corporation then decided not to cash the letter of credit since Chevron was a valued customer. Apparently, plaintiff renewed it's claim to be indemnified for the rentalease loss when it filed this suit. Presumably, any cause of action that defendant stockholders had against Chevron had, in the interim, expired. LSA-C.C. Art. 1901 (now LSA-C.C. Article 1759) provides that all agreements must be performed with good faith. Under the circumstances, plaintiff did not perform with good faith when it failed to cash defendants' letter of credit and then reasserted its claim after defendants' right to seek indemnification from a third party had prescribed. The trial court properly denied plaintiffs claim for indemnification for this particular loss.
[4] The interest on the Gueydan office building, which the trial court awarded to plaintiff, is not included in this amount since the trial court's judgment ordered defendants to pay the interest on the $183,000.00 purchase price from December 10, 1981, until paid. We, of course, affirm that portion of the trial court's judgment.