517 So.2d 145 (1987)
CITY OF NEW ORLEANS; Blake G. Arata et al., representatives, etc.; and New Orleans Public Service, Inc.
v.
UNITED GAS PIPE LINE COMPANY.
LOUISIANA POWER & LIGHT COMPANY
v.
UNITED GAS PIPE LINE COMPANY and Pennzoil Company.
Nos. CA 3613, CA 3614.
Court of Appeal of Louisiana, Fourth Circuit.
April 30, 1987.
As Corrected May 13, 1987.
Rehearings Denied January 19, 1988.
*149 C. Murphy Moss, Jr., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, W. DeVier Pierson, Pierson, Semmes and Finley, Washington, D.C., John R. Hutcherson, Brunini, Grantham, Grower & Hewes, Jackson, Miss., for United Gas Pipe Line Co.
Charles W. Lane, III, John W. Haygood, R. Patrick Vance, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, Clayton L. Orn, Anderson, Brown, Orn & Jones, Houston, Tex., William C. Nelson, New Orleans, for New Orleans Public Service, Inc.
Donald R. Mintz, Constance Charles Willems, Ellis B. Murov, Pia Conte, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, for City of New Orleans and Blake G. Arata et al.
Andrew P. Carter, Kenneth P. Carter, Terrence G. O'Brien, Monroe & Lemann, New Orleans, for Louisiana Power & Light Co.
Stephen M. Hackerman, Baker & Botts, Houston, Tex., Gene W. Lafitte, Frederick W. Bradley, Liskow & Lewis, New Orleans, for Pennzoil Co.
Marshall B. Brinkley, Gen. Counsel, Louisiana Public Service Com'n, Baton Rouge, Michael R. Fontham, Wayne J. Lee, Paul L. Zimmering, Stephen G. Bullock, Noel J. Darce, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for Louisiana Public Service Com'n.
Before REDMANN, C.J., and KLEES and LOBRANO, JJ.
REDMANN, Chief Judge.
United Gas Pipe Line Company appeals from judgments for breach of contract damages in favor of Louisiana Power and Light Company for $40,309,142 and New Orleans Public Service, Inc. (and the class of persons paying the latter's electric rates during the breach) for $44,403,106. LP & L and NOPSI were obliged by the contracts to buy, and United was obliged to supply to them, their requirements (or part-requirements) of natural gas for electric power plants over periods of up to 25 years. United raises many issues, including whether the trial judge should have been recused; whether the ratepayers have a right of action; whether some damages were wrongly awarded because not caused by its alleged breach; and whether pre-judgment interest was wrongly awarded. United's principal argument is that a national gas shortage and governmental distribution *150 orders reduced or excused its contractual delivery obligations, both because the contracts so provide in cases of gas shortage, governmental orders, or force majeure, and because of a variety of other defenses.
The plaintiffs appeal or answer United's appeal (in either case referred to as an appeal), seeking added amounts or items of damages. LP & L seeks judgment in tort against United (as does the class) and against its one-time corporate parent, Pennzoil Company (whose corporate relationship is detailed in Louisiana Power & Light v. United Gas Pipe Line, 493 So.2d 1149 (La. 1986)). LP & L also seeks deletion of the judgment's provision for deposit of its award into the trial court's registry until the court rules on a method of distribution to its customers.
We note the intervention on the side of LP & L by the Louisiana Public Service Commission, whose position is akin to that of an amicus curiae, seeking awards only for LP & L. We also note the City of New Orleans's anomalous claim of a right of action (presented in NOPSI's original petition) as the governmental rate-setting body for NOPSI. The briefs of the PSC and of the City and class, in addition to those of the contractual parties, have very much assisted this court in its review of the judgments appealed.
We conclude that the record supports the trial judge's factual conclusion that United did not prove its affirmative defenses for its conceded failure to deliver the contracted gas. United did not prove that, if it had not released gas reserves that it already had (and had acted with reasonable diligence to acquire additional available gas reserves to meet its already existing contractual commitments and had not further committed itself to new sales of gas), the shortage would still have occurred (or to what extent) on its interstate and New Orleans area intrastate pipelines. United did not prove that its actions did not cause its shortage and were not, at the least, a breach of its implied contractual obligations under its contracts to provide gas. We reason that the contractual impairment of deliveries clause does not purport to exonerate United from liability; that the governmental orders would not have been necessary as to United but for United's self-caused shortage; and that the force majeure clause is inapplicable because United did not prove that the shortage was not within its control. We increase the amounts of damages awarded for increased costs of fuel (and purchased electricity) and we add damages for part of the costs of conversion of the generators to oil-burning. We agree that pre-judgment, but not pre-damage, interest is allowable, with La.C.C. 2924 rates on pre-suit damages only from 1980, and in those senses we reduce the interest award. We delete the provision for deposit of LP & L's damages into court, because questions of rebate or rate reduction fall exclusively to the Louisiana Public Service Commission (or the New Orleans City Council, as to Algiers rates) rather than to any district court. We agree that no tort claim is available against United or Pennzoil.
It is undisputed that United did not supply the gas that, unless somehow excused, it was obliged to supply for LP & L's and NOPSI's power plants under the long-term contracts. United is therefore liable for the damages caused by its failure to deliver the contracted gas, unless it proves that its delivery obligation is reduced or excused by one of its several defenses.
Essentially, all of United's defenses partake of the nature of impossibility of performance because of a nationwide gas shortage and federal commission and court orders adopted because of that shortage. Essentially, the trial court's response, which we deem not manifestly erroneous but supported by the evidence, is that United bound itself to perform its contracts with LP & L and NOPSI, and that United did not prove that it did perform those contracts reasonably and in good faith: did not prove that it acted reasonably, in view of its performance obligations, to acquire and maintain sufficient gas reserves to satisfy its contractual obligations. The trial court's reasoning is that United itself brought about its shortage, which therefore *151 does not exonerate United from liability.

UNITED'S APPEAL
United's arguments on appeal can be grouped into five: (I) the trial judge should have been recused because he was a member of a plaintiff class who would directly participate in the proceeds of judgment; (II) the ratepayers have no right of action for contractual damages from breach of a contract to which they were not parties; (III) liability was imposed on United without any consideration of the effect of the well-recognized gas shortage of the 1970s on United's ability to serve its customers and without reasoned analysis of the prudence of United's management of its gas supplies; (IV) damages were awarded for reductions in deliveries brought about entirely by federal order rather than by United's shortage of gas; and (V) the award of prejudgment interest dating back to the initial claims of the plaintiffs in 1974 and the award of all costs against United were improper.

I. RECUSAL
We have no authority to consider United's argument that the trial judge, because a member of a plaintiff class of electric ratepayers, should have been recused. Although United cites the later Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), the question of recusal in this very case has already been decided, rightly or wrongly, by the Louisiana supreme court: "The motion to recuse is denied on the merits." City of New Orleans v. United Gas Pipe Line Co., 407 So.2d 714 (La.1981). The courts of appeal have no jurisdiction to review decisions of the Louisiana supreme court. La. Const. (1974) art. 5 § 10(A).

II. RATEPAYERS' RIGHT OF ACTION
We also do not decide whether the trial court should have sustained the exception of no right of action aimed at the NOPSI ratepayers, represented by several individuals and the City of New Orleans and the State of Louisiana. The first petition for damages was filed on behalf of the ratepayers and NOPSI together. NOPSI does not complain of sharing its recovery with the ratepayers, and United does not show any post-trial burden resulting from the arguably improper maintenance of the ratepayers' right of action. Also because it is of no concern to United, we change from January 1, 1973 to April 1, 1971, as the class requests, the trial judge's erroneous specification in the judgment of the date from which all electric ratepayers constitute the plaintiff class.

III. THE GAS SHORTAGE AS EXONERATION
That gas in ample quantity was unavailable from 1970 or so is not gainsaid. Beginning in 1968 and continuing through the 1970s, nationwide gas reserves declined as usage exceeded additions. But the shortage did not produce the results United claims by its many defenses, some of which overlap (as do this opinion's discussions).

III(a). INDUSTRY CONDITIONS AND UNITED'S ACTIONS
United's basic contention is that it did seek to perform, reasonably and in good faith, its contractual commitments; that its purportedly imprudent or improvident management decisions were in fact reasonable and blameless, given the conditions existing at the time and the knowledge available at the time, including the expectations regarding the size and accessibility of underground reserves of natural gas. The genuine shortage of natural gas during the 1970s in Louisiana and throughout the nation, United claims, was unforeseeable and beyond the control of any individual pipeline company.
The trial court concluded that United's management of its gas supplies, including releases, acquisitions and sales, was imprudent and constituted the sole cause of its shortage. United claims that the trial court's evaluation of United's conduct was flawed because the court did not identify what was imprudent, based its findings on a purely retrospective analysis, and ignored the practices and expectations of the pipeline industry.
*152 United claims that its expectations about the future availability of natural gas were reasonable and consistent with industry expectations; that it had no reason to believe in the period of 1960-66 that it faced a possible shortage. United asserts that it first became aware of possible peak-day shortages in 1969, and that its maintenance of its gas reserve inventory was reasonable and responsive to changing supply and market conditions.
United contends that it could not reasonably maintain the reserves it had because its contracts obliged it to take certain proportions of production annually or else pay for them, and that increasingly high levels of penalty payments for failure to take the contracted gas, caused by its inability to increase sales meaningfully until 1965, coupled with the continual increase in proved reserves in take-or-pay fields boding yet higher penalties, made it impossible for United to maintain existing reserves or make major new gas acquisitions for its interstate system until after 1965. In late 1965 and early 1966, as its system-wide oversupply problems were in the process of being resolved, United contends it recommenced the acquiring of major new reserves.
United asserts that it was not until 1970, when it began to experience a sudden unavailability of new reserves, combined with continued delays in the construction of an ambitious offshore project and unforeseen downward revisions of estimates of its remaining reserves, that United realized that it would not be able to get sufficient new reserves to avoid some system-wide curtailments.
Another element contributing to United's predicament was that customers varied their level of takes during the year, at differing percentages of their maximum contract levels. The ratio of actual deliveries to the maximum contract limit is known as the annual load factor. The load factor of United's pipeline customers increased from 81% in 1965 to 94% in 1969. United's power plant customers also increased their load factors. United claims that the increases within existing maximum daily quantities under contracts were not predicted by customers or by United. According to United, new or enlarged commitments entered into after Jan. 1, 1968, account for less than 1% of total sales (excluding sales by facilities transferred to Pennzoil) during 1968-1970, and, by comparison with increasing load factors and other problems (increased sales on prior contracts were 14% of total sales), new sales were not, as the trial judge had found, a significant factor in its ultimate curtailment of deliveries.
In short, United contends that when considered in light of the problems it had to address, the information available to it at the time, and the accepted industry custom and practice, United's business decisions regarding the management of its gas supplies were reasonable and designed to ensure adequate supplies for United's customers.
We conclude, as amplified in the discussion below of United's more particularized defenses, that United's actions, however reasonable in other contexts, were not reasonable in the context of firm requirements contracts, because they did not constitute a reasonable effort to perform those contracts, especially in their implied obligations to have and maintain, or to acquire, at whatever cost, the gas necessary to fulfill the explicit delivery obligations.
On its New Orleans intrastate line, which supplied LP & L's Ninemile Point plant and NOPSI, for example, in the years 1962 through 1969, United released massive reserves of gas under contract. These releases were the result of United's contractual attempts (some allowing the producer the right to cancel United's rights) to avoid costly and escalating penalty payments, under "take or pay" contracts, for failure to take gas as United had contracted to do. By these releases, United lost reserves of some 2,063 billion cubic feet (Bcf) between 1962 and 1969 (and in 1967 shifted another 269 Bcf to an interstate system) from its New Orleans intrastate line. Annual sales from that pipeline in 1968 and 1969 were about 150 Bcf. The released reserves would have provided gas at that rate for *153 over 13 years. (NOPSI's claim covers only about five years. While LP & L's Ninemile contract extended some 17 years at determinable prices, the delivery obligation actually decreased from 100% of requirements for the existing three generators to a third of requirements for those plus a planned fourth, once the fourth began operation. This decrease reduced the contractual daily maximum from 125,000 to 80,000 thousand cubic feet (Mcf). 17 years of reduced delivery would have roughly equalled 13 years of the original delivery.) The primary reason gas was not provided to Ninemile and NOPSIthe reason there was a "shortage"was that United released those reserves notwithstanding its contractual obligations to supply gas.
The releases of those reserves (over half to Humble Oil as a result of an "omnibus agreement" of October 1, 1962) had business considerations as their purpose, and in that sense may well be described as reasonable. United's contract for one of the largest fields enabled the producer to cancel if United did not take 25% of the field's production capacity for two years, and United did not take that quantity despite a price reduction aimed at increased consumption. Other contracts included "take or pay" provisions that obliged United to pay for specified minimums based on reserves even if not taken. Those provisions cost United $754,702 in 1960 and $6,776,068 in 1961 (and were expected to cost more as additional reserves in the contracted fields were discovered). United argues that its releases of reserves were reasonable responses to problems such as these. One may well accept that reserve releases were reasonable for United's purposes, but the releases, and the intrastate system shortage they caused, simply were not beyond United's controlas is required for the applicability of the contract's force majeure provision and the Civil Code's impossibility defense.
United's conversion of the New Orleans intrastate system into part of the interstate system (by injecting interstate gas), United argues plausibly, was more beneficial than harmful to intrastate system customers, in that the gas that had been still attached to the former intrastate system (after the releases) was used in that lower-pressure ("locked-in") system only, which also received additional gas from the higher-pressure remainder of the interstate system. Also plausible is that United's sales to new intrastate system customers would, by themselves, not have created any problem for old customers (had the releases not occurred).
Even so, United's efforts as a whole to deal with (to escape) increasing costs of performance do not constitute good faith performance of its obligations, explicit and implicit, under its gas delivery contracts.
Thousands of times greater by absolute count, although less dramatic in proportion to usage, were the releases affecting United's interstate system, which served LP & L's Sterlington plant near Monroe. That system's annual usage was about 1,300 to 1,500 billion cubic feet between 1960 and 1968, with a growth trend of over 3% a year and with a total usage during that period of about 12,454 Bcf. During that period United released almost 4,590 Bcf while adding only about 4,083 Bcf. Thus, over that nine-year period, that system suffered a continuing and increasing decline of reserves of over 1,300 Bcf a year from usage plus a slight further decline because additions to reserves were more than offset by releases of reserves. Had reserves simply been maintained at the 1960 level, United could have met its delivery obligations under its contracts for well beyond another nine years. LP & L's Sterlington contract only ran about eight years from the first curtailment. The record shows that there was no gas shortage in the early 1960s, and the trial judge's conclusion was therefore reasonable that United could have acquired additional reserves that, coupled with the reserves it released, would have maintained its reserve position and its ability to fulfill its contractual obligations over the lives of the contracts at issue. United does show that take-or-pay costs and other considerations prompted its business decisions, but increased costs to perform do not excuse nonperformance of contracts. In perspective, penalty pre-payments for gas of *154 $7,000,000 a year (or their balance of $15.3 million by 1963 or even $21.3 million by 1965) to assure ability to comply with its contracts, although truly a substantial amount of money, are not so excessive a "prepayment [of] working capital" (as the Federal Power Commission deemed them) as to justify nonperformance by an enterprise whose annual sales of 1,300,000,000 thousand cubic feet of gas, if all sold at a minimum price of $.175 per Mcf (its 1956 contract prices for LP & L were from $.175 to .745) would bring annual gross income of $227,500,000.

III(b). CONTRACT CONSTRUCTION
United argues (and the trial court agreed) that the contracts authorize certain curtailments, and that those curtailments would therefore not constitute a breach of the contracts. United argues that the trial court erred, however, by improperly identifying the circumstances authorizing curtailments and by finding that those circumstances were not present.
In particular, United argues that the "impairment of deliveries" clause should operate to allow curtailments without liability if a shortage exists, provided only that the shortage was not brought about through United's bad faith. The trial court ruled that in addition to there being a shortage, the shortage has to be the result of force majeure and United has to have "prorated its gas supplies between its customers in the order of priorities enumerated," before the impairment of deliveries clause would reduce or suspend United's delivery obligations. United argues that its curtailment priorities differed from those enumerated only because federal commission curtailment orders required curtailment priorities as mandated under the Natural Gas Act and that those orders superseded contract priorities because of the contracts' "duly constituted authorities" clause. Furthermore, United claims that the impairment of deliveries clause is not dependent on the "force majeure" clause, but is intended to be operative with respect to any system-wide shortages that would impair deliveries. Finally, United argues that the trial court erred in determining and applying the appropriate fault standard under the impairment of deliveries clause.
Impairment of Deliveries
Except for a 1974 amendment of the LP & L Sterlington plant contract that preserved LP & L's rights theretofore and is not of concern thereafter, the impairment of deliveries clauses in the contracts were similar in substance to that here reproduced:
"Buyer specifically recognizes the fact that Seller delivers gas to gas utilities for resale to domestic consumers and to public utility power plants for generation of electricity which is sold to domestic consumers and to other industrial consumers. In the event a shortage of gas renders Seller unable to supply the full gas requirements of all its consumers, then it is mutually agreed that the gas requirements of gas utilities selling gas to domestic consumers shall first be supplied by Seller and next the gas requirements of public utility power plants (including plant of Buyer) using gas for generation of electricity which is sold to domestic consumers, shall be supplied, and if Seller does not have sufficient gas to supply all of the requirements of said power plants, then said requirements shall be supplied ratably. The remaining available gas supply shall be prorated by Seller among its other consumers."
(The earlier Sterlington contract provided that "requirements of gas utilities selling gas to domestic consumers and ... power plants using gas for generation of electricity... sold to domestic consumers shall first be supplied ..., and the remaining available gas shall be prorated by Seller among its other consumers.")
United complains that the trial judge erred in construing the impairment of deliveries clauses as excusing delivery only if prevented by force majeure and then only if the clauses' priorities are followed. (An overlapping defense, discussed below, is that supervening federal orders set other priorities.)
United argues that the contracts contain entirely separate clauses on force majeure, to which the impairment of deliveries *155 clause makes no reference. Most persuasive is that, during contract negotiations, United refused LP & L's request to expressly limit the impairment of deliveries clause to force majeure conditions.
We agree that the impairment clause was intended to apply in all situations, and not only in force majeure conditions. Any shortage, for any reason, triggers operation of the impairment clause. For example, a former president of United testified that United would prorate deliveries in accordance with the impairment clause in case of a shortage clearly caused by a United employee's negligence. It appears to us indisputable that the impairment clause in such a situation would entitle the power plants to gas before "other consumers" (save domestic consumers).
The universal applicability of the impairment clause in cases of shortage does not, however, mean universal nonliability in cases of shortage. If every shortage excuses delivery obligations, the force majeure clause becomes meaningless. The contract to supply requirements becomes instead a contract to sell whatever is available.
The impairment of deliveries clause simply does not purport to address the question of whether a "shortage" reduces or eliminates United's contractual obligations. All that the impairment clauses in United's gas sales contracts say is that, in case of shortage, gas will go first to domestic gas users, then to domestic electricity users (through power plants), and then to other users. As the contractual characterizations buyer and seller indicate, United contracted not merely to transport gas over its pipelines, but to sell as well as deliver gas to LP & L and NOPSI.
The general rule of contract law is that contracts are enforceable and "have the effect of laws on those who have formed them," requiring their performance "with good faith." La.C.C. 1901 (1870). These contracts expressly made firm delivery commitments (unlike some industry contracts for "interruptible" delivery). The impairment of deliveries clauses therefore cannot be construed to mean that these gas contracts are simply not enforceable whenever, despite its contractual agreement to supply power plant requirements, United does not have sufficient gas to perform them. Those clauses cannot be construed to excuse nondelivery in the case of a shortage that United could have avoided by reasonable foresight and good faith performance of the implied obligation to maintain (or acquire) sufficient quantities of gas to meet LP & L's and NOPSI's contractual entitlements. The LP & L Sterlington and NOPSI contracts both represented that United "has a supply of gas available for delivery to Buyer and is willing to sell and deliver ... in the quantities as hereinafter provided."
We find no manifest error in the trial judge's finding that United did not exercise the reasonable foresight that good faith performance of its contracts required. To the contrary, the evidence is that, for business reasons aimed not at performance of its contracts but at saving costs, United released substantial reserves, which would have met then-current needs for several years, and did not acquire others at a time when at least some could have been acquired, and increased delivery commit ments by additional sales despite declining reserves. We repeat that it was United's burden to prove its defenses, and United's proof does not demonstrate error in the trial judge's basic conclusion that, on both its interstate and intrastate pipelines, the exercise by United of reasonable foresight, in an effort at good faith performance of the contractual obligations it had already undertaken, long before the national gas shortage, would have enabled United to perform these contracts.
Force Majeure
The contracts also contained force majeure clauses, which suspended the obligations of a party when "rendered unable wholly or in part by force majeure to carry out its obligations...." The contracts define force majeure as
"acts of God, strikes, lockouts or other industrial disturbances, acts of public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, *156 earthquakes, fires, storms, floods, washouts, arrests and restraints of governments and people, civil disturbances, explosions, breakage or accident to machinery or lines of pipe, the necessity for making repairs or alterations to machinery or lines of pipe, freezing of wells or lines of pipe, partial or entire failure of wells, and any other causes, whether of the kind herein enumerated or otherwise, not within the control of the party claiming suspension and which by the exercise of due diligence such party is unable to prevent or overcome...."
The trial judge's factual conclusion, reasonably supported by the record, was that by the exercise of due diligence, in not releasing reserves, in acquiring reserves when it could have done so, and in not committing itself to further deliveries by added sales atop its preexisting contractual obligations, United could have prevented the shortage that its own actions caused. In such a factual situation, the force majeure clauses by their own definition do not apply and therefore did not suspend United's obligations.
Duly Constituted Authorities
The contracts also contained "duly constituted authorities" clauses: "This agreement is especially made subject to all present or future valid rules, regulations or orders of any commission or regulatory body having jurisdiction."
There is only one essential thing that must be said about the federal orders adopted to cope with the shortages of gas that developed on United's interstate and its Louisiana intrastate pipelines. The essential thing is that those orders did not expropriate any of United's gas or otherwise prevent United from using whatever gas it had to make deliveries to its customers. Those orders are not the cause of United's failure to meet its contractual delivery obligations to its customers, including LP & L and NOPSI. Those orders did no more than establish, because United could not supply all of its customers, a priority among its customers in entitlement to the gas that United did have.
United argues persuasively that the priorities established by the federal orders superseded the priorities established by the contractual "impairment of deliveries" clause. That argument affords United no escape from liability, however, because the trial judge's reasonably supported factual conclusion is that there would have been no shortage at all, and no reason for any impairment of deliveries according to either federal or contractual priorities, had United rendered the performance over the preceding years to which its earlier contracts obliged it.

III(c). FEDERAL INTEREST
United argues, as an argument apart from the duly constituted authorities contractual argument immediately above, that there is a federal interest that curtailments be uniform, nondiscriminatory, and in accordance with the objectives of the Natural Gas Act; that state law breach of contract liability is preempted by that interest (embodied in federal orders and tariffs), except, at most, in case of a pipeline's fault determined by federal standards of willful misconduct or reckless disregard of contract obligations.
The trial court concluded that federal curtailment orders and tariffs would not exculpate United from contractual liability for curtailments in the instant cases because United's shortage "was induced by the unrealized expectations and imprudent decisions of United and its management." United argues that the fault standard for determining whether exculpation lies under United's tariff and Commission orders is a federal fault standard, and that the federal standard is willful misconduct or reckless disregard of the pipeline's service obligations.
United does not cite any authority establishing this separate "federal interest" argument. We conclude that it is inconsistent with the expressions of cases like Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); International Paper Co. v. Federal Power Com'n, 476 F.2d 121 (5 Cir.1973); Monsanto Co. v. Federal Power Com'n, *157 463 F.2d 799 (D.C.Cir.1972); and Texasgulf, Inc. v. United Gas Pipe Line Co., 610 F.Supp. 1329 (D.C.D.C.1985). These cases support the view that, notwithstanding that federal orders or tariffs may override any state law liability akin to strict liability or liability without fault, breaches of contract not only by willful misconduct, but also by negligence or lack of due diligence, are governed by state law standards. This defense seems to be no more than a restatement of the "duly constituted authorities" clause defense discussed earlier, and we deem it equally insufficient to avoid United's liability.

III(d). LOUISIANA CODE DEFENSES
United also argues that the trial judge erred in rejecting its separate defenses, under the Louisiana Civil Code, of fortuitous event or irresistible force, failure of cause, error as to motive, and implied condition.
Fortuitous Event
United contends that the nationwide gas shortage was a "fortuitous event or irresistible force" within C.C. 1933(2) (1870). United cites cases of performance excused by flood (Viterbo v. Friedlander, 120 U.S. 707, 7 S.Ct. 962, 30 L.Ed. 776 (1887)) and very heavy rainfall (Davis v. Tillman, 370 So.2d 1323 (La.App. 2 Cir. 1979)). But those were not cases in which, for example, a contractor was held not liable for the failure of a flood-wall or roof because of flood or rainthat is, was exonerated by the occurrence of the risks that his contract undertook to protect against. United's contracts undertook to provide gas requirements over specified periods of many years and, by necessary implication, to do what was necessary to have the gas to be able to provide it. Had United done the necessary, there would have been no "fortuitous" shortage on its lines here involved. United's fortuitous event or irresistible force defense, C.C. 1933(2) (if applicable despite United's arguably "active" breach, C.C. 1931, by release of reserves), is not different in substance or in result from its contractual force majeure defense.
Lack or Failure of Cause; Error; Condition
United also argues that there was a lack or failure of cause in the contracts in question and therefore they can have no effect; that the error of the parties in assuming the continued availability of natural gas was an error as to the principal cause, thereby vitiating consent to the contracts; and that the availability of gas was at least an implied condition of the contracts.
United argues that civil law "cause," C.C. 1893 (1870) (largely analogous to common law consideration), for United's obligation to deliver LP & L's and NOPSI's requirements was lacking or failed. United cites art. 1897's declaration that a contract is without cause "when the consideration for making it was something which, in the contemplation of the parties, was thereafter expected to exist or take place, and which did not take place or exist." Art. 1897 itself exemplifies its meaning: "A gift in consideration of a future marriage is void by this rule, if the marriage do not take place." The record suggests that United, in failing to put itself into a position of ability to perform its long-term contracts, may have relied on a "contemplation" that gas would always be available; but it does not suggest that LP & L and NOPSI, in obtaining firm 20-year contracts for requirements, relied on that contemplation. That is not the tenor of the contracts. United did not contract only that, as long as gas were freely available, it would transport it through its pipelines to LP & L and NOPSI. United's argument from art. 1897 would transform United's obligation from one to supply requirements into one to supply what it might have available, and that was not the intent of the contracts. The utility companies did not commit themselves to buy the contracted requirements exclusively from United for 20 years for the "principal cause" that gas was assumed to be readily available, nor in exchange for a conditional obligation that United would sell if gas were available. The utilities committed themselves to buy exclusively from United for the described contract prices in exchange for United's *158 commitment that it would have and deliver gas. The utilities' commitment was the cause for United's obligation (not conditioned on the availability of gas), just as United's commitment was the cause for the utilities' obligation. The contracts were ordinary requirements contracts that are not invalid for lack or failure of cause or consideration.

IV. CAUSATION OF CERTAIN DAMAGES

IV(a). FEDERAL ORDERS
United argues that the major part of the reductions in deliveries for which damages were awarded was caused by federal order eliminating the power plant preference of the contractual clause on curtailment of deliveries, rather than by United's shortage of gas. United claims that orders of the federal government required United to take gas that it actually had and deliver it to other customers. In January 1973, FPC Opinion No. 647 in United's curtailment case ordered United to immediately eliminate the power plant preference from its curtailment tariff because of the nationwide gas shortage. As a consequence, United argues that 80% of NOPSI's requirements and 50% of LP & L's requirements fell to the lowest curtailment category and United could not legally reinstate the power plant preference. Accordingly, United claims it is not liable for alternative fuel costs caused by the federal abolition of the power plant preference because those costs were not the immediate and direct result of United's alleged breach of contract. United contends that even with the shortage, most of plaintiffs' damages would not have been incurred if the FPC had not eliminated the power plant preference. Furthermore, United argues that the FPC and federal court orders abolishing the power plant preference constituted a fortuitous event or irresistible force under C.C. 1933(2), which prevented United from supplying gas. In addition, United asserts that the FPC and federal court orders preempt state court damage awards for curtailments resulting from abolition of the power plant preference. United therefore argues that NOPSI's and LP & L's damages should be reduced by the amount attributable to the elimination of the power plant preference.
Much of this argument, to repeat, overlaps earlier arguments. As we have analyzed it earlier, the curtailment clause did not exonerate United of liability in case of shortage, but merely provided a priority of distribution that would cause other customers to suffer the damages rather than power plants. Federal orders eliminating the power plant preference may be characterized as causing the power plants to be the damaged plaintiffs, rather than other customers, irrespective of the extent to which United's shortage may have contributed to the federal commission's orders. But some customers were, inevitably, bound to be damaged by United's failure to perform its contractual obligations to procure and have sufficient gas to comply with its commitments. For that reason, we cannot conclude that the federal orders alone caused the damage, nor that United was without precedent "fault" within C.C. 1933(3) if the federal orders were deemed a fortuitous event or irresistible force.
Nor can we deem the damages from United's breach not "contemplated" by the contract, C.C. 1934(1), or not the "direct and immediate result" of the breach, C.C. 1934(2) (a limit on damages from bad faith breach and, a fortiori, on damages from simple breach). Our analysis is that the contract obliged delivery and the failure to deliver inescapably caused the damages awarded. Those damages were, in our opinion, unavoidably contemplated by the parties at the time of the contract. Similarly, the federal orders, although pertinent to whether the failure of delivery constituted a breach, do not negate the obvious conclusion that the failure to deliver directly caused the damages awarded.
We therefore find no error in the trial court's rejection of the federal orders as a defense.

IV(b). OTHER DAMAGES
United claims that in addition to the award of alternative fuel damages for *159 costs directly attributable to the FPC's elimination of the power plant preference, the trial court erred, first, in awarding damages for that portion of United's curtailments that were caused by the nationwide gas shortage, rather than by any fault of United; second, in awarding damages for alternative fuel costs at prices in excess of those reasonably contemplated by the parties at the time that pertinent contracts were executed; and third, in awarding damages to LP & L for increased maintenance and increased operating costs.
The first disputed award we deem sufficiently treated in discussing the arguments from the national gas shortage.
As to the second, we agree that the parties may not have expected a cost so high for replacement fuel, but they inescapably contemplated that failure to deliver the contracted fuel would necessitate (or at least justify) acquiring fuel elsewhere at market prices at the time of the breach. That the market was higher than foreseen does not mean that the contract is unenforceable, nor that its breach should not render the nonperformer liable for the contemplated result of the breach. See Litvinoff, Obligations, II, § 192 (Louisiana Civil Law Treatise, vol. 7), reviewing the Louisiana and French "traditional doctrine [that] the distinction between foreseen and unforeseen damages merely relates to the cause and not to the amount or quantum of the damages." (Litvinoff notes that arguably contrary modern French decisions treat losses of luggage containing "expensive jewels, or unusual lace, or even a valuable manuscript, which are not habitually carried in such a manner.")
As to the third disputed award, United's expert agreed that maintenance and operating expenses increase when burning oil instead of gas. United argues, however, that LP & L did not prove the amount of the increase in these expenses attributable to United's failure to deliver gas, and United therefore seeks reversal of the awards for these items. The trial judge's awards adopted the figures provided by United's proposed findings of facts. United's proposals were that, by eliminating damages "for periods when oil burns were not the result of United's curtailments," maintenance cost increase would be $208,532 (when "based on actual oil usage") and operating cost increase would be $289,676 (also eliminating "salary costs for personnel who were not engaged in burning oil"). The trial judge evidently relied upon the testimony of United's expert Nathaniel Hughes, whose career included 35 years with the Tennessee Valley Authority, ending as chief executive officer of its power department. These awards against United are therefore supported by the record. (We hereinafter consider the argument in LP & L's appeal that these awards were inadequate.)

V. COSTS AND PREJUDGMENT INTEREST
United argues that the trial court erred in its award of costs and prejudgment interest to the plaintiffs.

V(a). COSTS
As to costs, United argues that, in view of the complexity of the cases and the disposition of the parties' claims, the trial court should not have assessed all costs against United; rather, each party should have borne its own costs.
In part, we agree. La.C.C.P. 1920 provides:
"Unless the judgment provides otherwise, costs shall be paid by the party cast....
"Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable."
United was indeed the "party cast," in respect to the majority of the claims (if not of the majority of the amount in each). But as to some unsuccessful claims LP & L and NOPSI must be counted as the "party cast," and should bear the costs attributable to those claims and to their contribution to the 42,000-page transcript. We see no equitable basis to make United pay the costs reasonably attributable to unsuccessful claims against it. We grant some relief to United in our decree, *160 in a rough-justice apportionment considering all claims.

V(b). PREJUDGMENT INTEREST
Against prejudgment interest, United argues: (1) C.C. 1935 and 1938 and the Louisiana decisions limit prejudgment interest to cases where the object of performance is the payment of money; (2) prejudgment interest should not be awarded from judicial demand because the amounts of damages were not ascertainable at that time; (3) prejudgment interest should in no case have been awarded from judicial demand because demand was made before some of the damages awarded were incurred; and (4) prejudgment interest should not have been awarded at the escalating rates provided by amendments of C.C. 2924 subsequent to the 1974 judicial demands in these cases.
(1) Interest on Damages for Breach of Nonmonetary Obligation
Entirely independent of the meaning of C.C. 1935 and 1938, one may conclude, with United, from the nature of interest as money, that a contractual obligation to deliver gas cannot bear interest as such. One may further conclude that, as shown by art. 1934, damages from the breach of such an obligation are measured, instead, by the creditor's losses, including loss of profit.
Art. 1934 nevertheless provides, in cases of breach of a nonmonetary obligation, a monetary obligation to pay damages. Art. 1934(3) measures damages for breach of a nonmonetary obligation in terms of "pecuniary loss, or the deprivation of pecuniary gain." We agree with United that this monetary obligation arising from breach is not an explicit contractual obligation to pay money; that it is not (as United especially argues, citing Litvinoff, op. cit., II § 179) a transformation of the explicit contractual obligation to deliver gas. We further agree with Professor Litvinoff, however, as United's opponents emphasize, that "the obligation to pay damages `perpetuates' the contract, ... [and] is owed by virtue of the contract ... [wherefore] such an obligation also binds the surety...." The question before us at this point is whether this monetary obligation, not explicitly stated in the contract but nonetheless contractual in origin, bears interest.
Art. 1935
United argues not only that the obligation to deliver gas does not bear interest, but that C.C. 1935 (1870) limits interest to (the breach of express contractual) obligations to pay money. That argument begs our question by reading art. 1935 backwards. The article declares, in substance, that in all cases damages for breach of monetary obligations are interest; it does not declare that in all cases interest is damages for breach of (express contractual) monetary obligations. It limits claims for breach of (express contractual) monetary obligations to interest; it does not limit interest to such claims. Art. 1935 (1870) reads:
"The damages due for delay in the performance of an obligation to pay money are called interest. The creditor is entitled to these damages without proving any loss, and whatever loss he may have suffered he can recover no more."
The context of art. 1935 is set by art. 1934's measure of damages from breach of nonmonetary obligations, declared to be the loss sustained and the profit denied (with modifications). Art. 1935's intent, to substitute interest for those damages, is thus even more clear from that context. Art. 1935 does not support United's position.
Art. 1938
United makes a similar argument from C.C. 1938 (1970)'s provision that "All debts bear interest ... from the time they become due, unless otherwise stipulated." United argues that only (explicit contractual) monetary obligations bear interest, citing law dictionary definitions of debt as a sum of money due by express agreement. The Louisiana Civil Code does not so limit its concept of debt. Arts. 2131-2133 (1870) show the breadth of its concept:
"Art. 2131. By payment is meant, not only the delivery of a sum of money, when such is the obligation of the contract, but the performance of that which the parties respectively undertook, whether it be to give or to do.

*161 "Art. 2132. He who is bound to do, or not to do, or to give, is indifferently called the obligor, or the debtor; and he to whom the obligation is made is in like manner without distinction called the obligee or the creditor.
"Art. 2133. Every payment presupposes a debt...."
(See also art. 3556, subds. (20) and (21), equating obligee with creditor and obligor with debtor.)
Art. 2131 shows that, under the Louisiana Civil Code, payment includes performance of nonmonetary obligations; and art. 2133 shows that such a performance "presupposes a debt." Together these articles show, as do arts. 2132 and 3556 in identifying debtor with obligor and creditor with obligee, that "debt" is as broad in meaning as "obligation" is, under the Louisiana Civil Code.
Our conclusion is that art. 1938's provision that debts bear interest from the time they become due is applicable to debts owed as damages for breach of a nonmonetary contractual obligation, unless some other law prevents its application.
Louisiana Decisions
United relies on Sugar Field Oil Co. v. Carter, 214 La. 586, 38 So.2d 249 (1948), and Quinn Construction Co. v. Savoie, 207 So.2d 229 (La.App. 4 Cir.1968), cert. denied 252 La. 117, 209 So.2d 42 (1968). Sugar Field explains its refusal of prejudgment interest in a quantum meruit case thus:
"The plaintiff prayed for interest from date of judicial demand. The recovery in this suit is predicated on quantum meruit. It is, therefore, an unliquidated claim. Under Article 554 of the Code of Practice [1870] `interest at the rate of five per cent shall be allowed on all debts from the time they become due, unless otherwise stipulated'. (Emphasis ours.) It is true that interest is permissible from date of judicial demand in all ex delicto suits but this is purely statutorysee Act No. 206 of 1916, § 1. In this suit the district judge correctly allowed interest from the date of judgment. On that date the claim had become certain and liquidated by reason of the judgment. Connette v. Wright, 154 La. 1081, 1090, 98 So. 674 [1924]."
If Sugar Field is not directly in point because an action in quantum meruit, United argues, its reasoning that interest was not recoverable because the claim was not liquidated is nevertheless controlling.
Quinn, supra, applied Sugar Field's reasoning in a claim by a contractor against a fired subcontractor for the contractor's excess cost of completing the subcontract. Quinn added that an unliquidated claim "cannot become absolutely ascertainable until fixed and determined by the court in its judgment." 207 So.2d at 234. A claim for excess cost of completion is essentially a claim for damages for breach of contract, and Quinn may therefore be deemed supportive of United's position.
The supreme court's latest decision in this area is Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978). Alexander is a bad faith redhibition case, and it (like the quantum meruit case of Sugar Field) may therefore be deemed not directly controlling. It does, nevertheless, point out the problem faced by a Louisiana court in deciding whether prejudgment interest should be awarded. Alexander observes:
"The decisions involving interest on sums recovered by suit are naturally myriad and because of their great number, if for no other reason, inconsistent. There is, however, a thread of consistency among the cases. Article 554 of the Louisiana Code of Practice of 1825 provided that interest should not run on accounts or unliquidated claims, but was repealed by La.Acts. 1839, No. 53 § 1. This Court once commented,
"`We have uniformly held that, since the passage of that act, all sums due on contracts bear interest from judicial demand, even where none has been stipulated, and the demand is unliquidated.' Sullivan v. Williams, 2 La. Ann. 876, 878 (1847).
See also Petrie v. Wofford, 3 La.Ann. 562 (1848); Calhoun v. Louisiana Materials *162 Co., 206 So.2d 147, 151-52 (La.App. 4th Cir.1968), writ denied, 251 La. 1050, 208 So.2d 324; and Friede v. Myles Salt Co., 177 So. 105, 108 (Orl.La.App.1937)." 359 So.2d 613.
Calhoun was a suit by an employee for a portion of the employer's net profits, as provided by the employment contract. The court of appeal amended the judgment to grant interest from the date each year the payment was due, rather than only from judicial demand, reasoning "interest is recoverable on claims arising ex contractu from the time they become due, whether they are liquidated or unliquidated," citing Friede.
Friede alone of the cases Alexander cites gives an extended analysis of the problem. Itself an action for professional services, Friede notes that its plaintiff's entitlement "must be determined on a quantum meruit basis." 177 So. at 107. The court nevertheless awarded interest from the date of plaintiff's billthat is, even before judicial demand. The court reasoned:
"Counsel for plaintiff argues that legal interest should have been allowed from the time at which the debt became due.... This argument is based on article 554 of the Code of Practice [1870] and on article 1938 of the Civil Code [1870]. But counsel for defendant maintain that the claim, until judgment was rendered, was an unliquidated one, and that, therefore, interest should be allowed only from judicial demand.
"We note that prior to 1839, interest was not allowed on accounts or unliquidated claims. Until that time, article 554 of the Code of Practice of 1825 provided that: `No interest shall be allowed on accounts or unliquidated claims.' We deem it significant that by Act No. 53 of 1839 that provision was repealed. Now, apparently as a result of Act No. 181 of 1852, the article reads as follows: `Interest at the rate of five per cent. shall be allowed on all debts from the time they become due, unless otherwise stipulated.'
"The Civil Code provision on the subject has sustained a similarly significant alteration. Article 1932 of the Code of 1825 provided that: `In contracts, which do not stipulate for the payment of interest, it is due from the time the debtor is put in default for the payment of the principal, and is to be calculated on whatsoever sum shall be found by the judgment to have been due at the time of the default.'
"However, that article (1932) of the former Code has now become article 1938 of our present Civil Code, which reads as follows: `All debts shall bear interest at the rate of five per centum per annum from the time they become due, unless otherwise stipulated.'
"It is obvious that both changes indicate an intention that interest shall be allowed on unliquidated, as well as on liquidated, claims, and that interest shall commence to run at the time the debt becomes due, regardless of putting in default.
"Act No. 106 of 1916, providing `that legal interest shall, hereafter, attach from date of judicial demand, on all judgments, sounding in damages, "ex delicto"' has no application, for, by its own terms, it controls only `* * * judgments, sounding in damages, "ex delicto."'" 177 So. at 108.
In Pease v. Gatti, 205 La. 949, 18 So.2d 511, 513 (1944), quoting that same passage from Friede, the supreme court awarded interest on an unliquidated damage claim from the time the damage was incurred, years before judicial demand.
Primarily because of Alexander, we conclude that prejudgment interest is not prohibited by the Louisiana decisions. With tens of millions of dollars of interest at stake, however, we do discuss several other cases that are cited by the parties or that cite Alexander.
Drs. Brown, Carter & Sauls v. Sauls, 418 So.2d 706 (La.App. 3 Cir.1982), cert. denied 422 So.2d 425 (La.1982), also cited by United, reasoned that interest did not run until 15 days after finality of judgment on an obligation to pay for stock, when the stock was to be delivered and paid for 15 days after finality of judgment. This reasoning *163 is consistent with the basic rule that interest runs from the due date of the principal obligation, but does not otherwise affect the present case.
City Stores Co. v. Gervais F. Favrot Co., Inc., 359 So.2d 1031, 1035 (La.App. 4 Cir.1978), affirmed interest from judgment on an award to a cost-plus contractor, noting many complicating factors and observing that it was only after having "considered these matters and rendered an award that a sum certain could be reached." Although the court did not use the word, it seems fair to characterize the court's reasoning as denying earlier interest on the ground that the amount due was not earlier ascertainable.
Land and Offshore Co. v. Martin, 469 So.2d 1177, 1186 (La.App. 3 Cir.1985), was a suit for damages for breach of contract. The court of appeal ruled, citing Alexander, that "the [trial] court should not have limited the interest to post-judgment interest. All sums due on a contract bear interest at least from the time of judicial demand." The damages were more easily ascertainable than those of LP & L and NOPSI, but they were nevertheless damages that had to be ascertained, and not mere return of purchase price or similar fixed dollar amount.
Magnolia Construction Co., Inc. v. Causey, 421 So.2d 990, 994 (La.App. 3 Cir. 1982), cert. denied 426 So.2d 177 (La.1983), awarded interest from judicial demand on a judgment for damages (loss of profit) from a contractor's breach of a building subcontract by hiring another subcontractor. The court reasoned:
"Counsel for the [subcontractor] cites Alexander ... and urges that interest on the judgment should run from the date of active breach of the contract. Alexander is a redhibition case. Although Justice Dixon cites Louisiana Civil Code Article 1932, which provides that damages are due from the moment of active violation, he also states that the Supreme Court has consistently said that all sums due on contracts bear interest from time of judicial demand. [Citing cases cited by Alexander.] Interest therefore should run from the date of judicial demand."
White v. Rimmer & Garrett, 360 So.2d 914, 919 (La.App. 3 Cir.1978), also involved damages for breach of a building subcontract. This case differed from Quinn (cited by United) in that firing of the subcontractor was held improper and the subcontractor recovered the profits he would have made from full performance. But the court of appeal reversed the trial court's award of interest from judicial demand, observing:
"In the recent case of Alexander ..., the court, although concluding that in matters of contract ... interest ... on a damage award is due from the moment of an active violation of a contract or from the time the debtor has been put in default when the breach is passive, determined that interest in such cases is awardable only from the date the amount of the award is ascertainable."
We note at this point that the third circuit in White in 1978 and the fourth circuit in Quinn in 1968 both refused prejudgment interest on the ground that the damages were not ascertainable. Yet the third circuit in 1982 awarded prejudgment interest on comparable subcontract breach damages, in Magnolia Construction, supra.
Messina v. Koch Industries, Inc., 267 So.2d 221 (La.App. 4 Cir.1972), aff'd 283 So.2d 204 (La.1973), decided before Alexander, was a suit for money due on a contract to supply labor, equipment, and material for a specified portion of a building contract, with material and labor to be charged at cost plus 10%. The trial court awarded interest from the last date that plaintiff performed under the contract, and defendant contended that interest should be allowed only from judicial demand. Rejecting that argument, the court of appeal reasoned:
"Interest is an item of damages due for delay in the performance of an obligation to pay money. C.C. art. 1935. Debts bear interest from the time that the obligation to pay money arises. C.C. art. 1938.... [P]ayment ... became due when the obligation to pay arose, not *164 when judicial demand for payment was made."
National Roofing & Siding Co. v. Gros, 433 So.2d 403 (La.App. 4 Cir.1983), citing Calhoun, supra, allowed interest from the time of completion, rather than only from judicial demand (as the trial court had awarded), on an award to a building contractor for contract price less cost of completion.
Lone Star Industries v. American Chemical, 461 So.2d 1063, 1069 (La.App. 4 Cir.1984), cert. denied 465 So.2d 738 (La. 1985), a suit for the price of oil in which both the price per barrel and the number of barrels were disputed, reasoned: "Interest on the disputed, or unliquidated, portion of the contract price is due from the time the amount became ascertainable, that is from the date of the judgment."
See also Louisiana Power & Light v. United Gas Pipe Line, 642 F.Supp. 781, 810 (E.D.La.1986), which awarded pre-judgment interest on LP & L's damages from breach of contract (overcharging) by United on deliveries from the mid-1970s under the 1968 Sterlington contract.
In reviewing these several decisions on prejudgment interest, we echo the supreme court's observation in Alexander that such decisions "are naturally myriad and because of their great number, if for no other reason, inconsistent. There is, however, a thread of consistency among the cases." 359 So.2d at 613.
Alexander itself confirms ascertainability as that thread, as the test to determine whether a debt bears interest only from judgment or, instead, from its due date (at least from judicial demand, a "putting in default," which renders due the damages from a passive breach of contract, C.C. 1933). The fundamental rule is that of C.C. 1938. Every (contractual) debt bears legal interest from its due date unless otherwise stipulated by the parties. A debt may be due before its amount is ascertained. Interest runs from the due date only if the amount is ascertainable. Interest may not run, not even from judicial demand, on a debt whose amount is not ascertainable except by a court's award (such as for reasonable attorney's fees as in Alexander, or for damages for breaching a contract for "intellectual enjoyment... or other legal gratification," C.C. 1934(3) (1870)).
One may well disagree with the individual result in some of the cases discussed above, without disagreeing with their basic reasoning. Their basic reasoning is that of Alexander: an amount that is not ascertainable bears interest from judgment, and an amount that is ascertainable bears interest from due date, which ordinarily is at least from judicial demand. The degree of difficulty of ascertaining ascertainable damages is not an obstacle to interest's running from their due date.
"Damages are due `from the moment' of an active violation of a contract (C.C.1932) and from `the time that the debtor has been put in default' when the breach has been passive. C.C.1933." Alexander, 359 So.2d at 613. Thus the obligation to pay the monetary damages for breach of the nonmonetary obligation to deliver gas arose, as to pre-lawsuit breaches, at the time that judicial demand put United in default, at the latest.
(2) and (3) Some Damages Not Ascertainable or Not Suffered as of Judicial Demand
Damages for alternate fuel costs already expended were both ascertainable and had already been suffered when suit was filed. United's monetary obligation to pay those damages was thus due, at the latest, upon judicial demand.
On the other hand, some damages, as for costs of alternate fuel that was yet to be required, were not ascertainable when suit was filed. No new requirements contract with another supplier fixed the alternate fuel costs over the life of the breached contract. United's obligation to pay the excess alternate fuel cost months or years later would depend, for ascertainment of its amount, on factors such as future market prices. We therefore agree that those costs were not ascertainable on the day of judicial demand, and that LP & L and *165 NOPSI are therefore not entitled to interest on those costs from original judicial demand (even if otherwise due from that time).
That LP & L and NOPSI had not yet paid for the alternate fuel for later months and years also affects the date from which interest runs. If future costs were ascertainable (as if, e.g., a new requirements contract would supply all fuel), the excess cost could be discounted to value at judicial demand and judgment awarded for that value plus interest from demand. In this case, however, future costs were not ascertainable on the day of judicial demand nor until they were in fact incurred. Interest cannot fairly be allowed on the undiscounted value of those future costs for months or years before the damages they represent were actually sustained.
We conclude that the fair computation of interest requires that the damages for the excess alternate fuel costs (i.e., their excess over the contract prices for power-equivalent quantities) be deemed to become due only at the time that those costs were incurred. The parties agree that a basic measure of this element of damages is reasonably approximated by LP & L's and NOPSI's own monthly fuel adjustment charges to their customers (although certain reductions from those charges are hereafter discussed in treating LP & L's appeal). That measure provides a means of approximating monthly excess alternate fuel costs and interest will run on all of them from the end of the month in which incurred. Interest will similarly run on other elements of damage from the time those damages were sustained and their cost ascertainable.
(4) Rate of Prejudgment Interest
The Louisiana Civil Code contained (until its partial revision by La.Acts 1984 No. 331) specification of the legal interest rate in both arts. 1938 and 2924.
Art. 1938 (1870) provided simply, "All debts shall bear interest at the rate of five per centum per annum from the time they become due, unless otherwise stipulated."
Art. 2924 (as amended, Acts 1908 No. 68) provided:
"Interest is either legal or conventional. Legal interest is fixed at the following rates, to wit:
"At five per cent on all sums which are the object of a judicial demand. Whence this is called judicial interest;
"And on sums discounted at banks at the rate established by their charters."
Over the course of this litigation the rate of legal interest was increased in three steps to 12% per annum. United argues that the rate of 5%, as provided by C.C. 1938 at the time of the contracts in question, continued to apply because of C.C. 1940:
"In cases where no conventional interest is stipulated, the legal interest, at the time the contract was made, shall be recovered, although the rate may have been subsequently changed by law."
The trial judge (in a proceeding testing the sufficiency of United's suspensive appeal bond) held that the rate increased as the law was changed, as now provided by C.C. 2924 though not by art. 1938.
The interest rates in both Arts. 1938 and 2924 were raised to 7% by La.Acts 1970 No. 315, to 10% by Acts 1980 No. 402, and to 12% by Acts 1981 No. 574. Art. 1938 was not otherwise changed. Art. 2924 was additionally changed, however, in the 1980 and later amendments, by the insertion of clauses making the new rates applicable to pending lawsuits from the effective dates of the amendments. As amended by Acts 1984 No. 458, Art. 2924 reads:
"A. Interest is either legal or conventional.
"B. (1) Legal interest is fixed at the following rates, to wit:
"(a) At twelve percent per annum on all sums which are the object of a judicial demand, whence this is called judicial interest; and
"(b) On sums discounted at banks at the rate established by their charters.
"(2) The rate of judicial interest resulting from a lawsuit pending or filed during the indicated periods shall be as follows:

*166 "(a) Prior to September 12, 1980, the rate shall be seven percent per annum.
"(b) On and after September 12, 1980, until September 11, 1981, the rate shall be ten percent per annum.
"(c) On and after September 11, 1981, the rate shall be twelve percent per annum."
United contends that art. 2924 applies to noncontractual cases, and that this contract case is governed by arts. 1938 and 1940.
Appellees cite art. 1936's declaration that "the rate of both [legal and conventional interest] is fixed by law in the chapter on loans on interest," which is art. 2924's chapter.
The parties cite several cases, but none addresses United's argument. Dyna International Corp. v. Mashburn, 397 So.2d 1080 (La.App. 4 Cir.1981), awarded interest under art. 2924's schedule on the price of merchandise. LeJeune v. J.W. Cappel Trust, 405 So.2d 647 (La.App. 3 Cir.1981), and Todd Shipyards Corporation v. Turbine Service, Inc., 574 F.Supp. 53 (E.D.La. 1983), both awarded interest under art. 2924's schedule on damages for breach of contract. But those cases do not discuss art. 1940.
We conclude, from the Code's several provisions cited, that art. 1938 applies to all obligations to pay money (save as delictual damages, governed by La.R.S. 13:4203), making interest payable from their due date (and providing legal interest unless a contract stipulates otherwise); art. 1936 places the fixing of rates in art. 2924; art. 2924 fixes legal interest rates for all debts that become "the object of a judicial demand," including "pending" lawsuits; art. 1940 may provide, for contractual debts that have not become the object of a judicial demand, that they shall bear interest at the rate at the time of contracting. We conclude that, in view of the explicit language of art. 2924 after its amendment effective September 12, 1980, art. 1940 cannot continue to apply to a debt for damages for breach of contract after that debt has been made the object of a judicial demand. Art. 1940 may still have application to a contractual obligation up until the time suit is brought upon the obligation. Until the 1980 amendment of art. 2924 to make the changing rates applicable to pending lawsuits, however, the earlier change in the rate of legal interest from 5% to 7% did not apply to these pending lawsuits, because the amending Act did not so provide. Succession of Drake, 359 So.2d 249 (La.App. 2 Cir.1978). On the other hand, it cannot fairly be contended that damages that had not yet been sustained, at the time of the increase to 7%, remained governed by the 5% rate; by the same reasoning that refuses "pre-damage" interest, we hold that the legal interest rate at the time that post-demand damages were sustained applies to these post-demand damages. The result is that interest is payable, as to all damages sustained before original judicial demand, at 5% until September 12, 1980, and thereafter at 10% and 12% in accord with art. 2924's schedule; and, as to all damages sustained after judicial demand (which occurred after the 1970 amendment of art. 2924), at 7% until September 12, 1980, and thereafter at 10% and 12% in accord with art. 2924's schedule.

LP & L'S APPEAL
LP & L's appeal argues that (I) its delictual claim against United and Pennzoil should not have been dismissed; (II) the damages awarded for breach of contract were inadequate; and (III) the trial judge's order to deposit LP & L's damages with the court for its further orders is unauthorized by law.

I. LP & L'S DELICTUAL CLAIMS
LP & L claims, against United and United's onetime sole or controlling shareholder Pennzoil, that their acts damaged LP & L and that they are therefore liable for that damage under the delict (tort) rule of La. C.C. 2315:
"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."
LP & L also relies on C.C. 2324 (1870):
"He who causes another person to do an unlawful act, or assists or encourages *167 in the commission of it, is answerable, in solido, with that person, for the damage caused by such act."
The record demonstrates that United's acts, abetted if not controlled by Pennzoil, damaged LP & L. LP & L cites (among other cases) Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081, 1096 (La.1983), for the rule that "a party can incur liability in tort, notwithstanding a contractual relationship ... where the act causing the damage constitutes both a breach and legal fault." Howard Trucking awarded over $60,000, against a trucker and its tort liability insurer, for loss of methanol production during repair time attributable to the trucker's negligent damaging of a compressor it had contracted to transport for plaintiff. If scholars may dispute whether that kind of consequential damages should be allowed in any case (as Howard Trucking's four-three decision demonstrates), the rule seems quite beyond dispute that the existence of a contract does not confer tort immunity.
As to United, however, the legal cause of LP & L's damages was not some act that "constitute[d] both a breach [of contract] and legal fault," both a breach of the contract's "effect of laws" between the parties and also a breach of duty under general law. The cause of LP & L's damages was, simply, that United failed to perform its contractual obligations toward LP & L. United did not breach some general-law duty such as to drive safely, or to safely locate or pressurize or otherwise maintain its gas lines so as to avoid injury to third persons. If LP & L had had no contract with United, United would have had no obligation under general law (other than safety rules) towards LP & L to so deal with United's gas and pipelines as not to injure LP & L. LP & L's damage was the result not of any breach by United of a general legal duty, but of the breach of duties arising exclusively from contracts. United's conduct was not a delict, and United is not liable in tort to LP & L.
LP & L argues that Pennzoil is liable in tort for inducing United to breach its contract with LP & L (or for tortious interference with that contract), although Pennzoil itself had no contractual obligation towards LP & L.
The Louisiana supreme court has held that an action cannot be maintained for inducing a third person to break his or her contract. Kline v. Eubanks, 109 La. 241, 33 So. 211, 213 (1902); B.J. Wolf & Sons v. New Orleans Tailor-Made Pants Co., 113 La. 388, 37 So. 2 (1904). It has repeated that rule in Moulin v. Monteleone, 165 La. 169, 115 So. 447, 448 (1927); Cust v. Item Co., 200 La. 515, 8 So.2d 361, 363 (1942). See also Forcum-James v. Duke Transportation, 231 La. 953, 93 So. 2d 228 (1957); and PPG Industries, Inc. v. Bean Dredging, 447 So.2d 1058 (La.1984). There have been indications that the court might reconsider that rule. Sanborn v. Oceanic Contractors, 448 So.2d 91, 95, n. 5 (La.1984). Those indications do not put it within the authority of a court of appeal, however, to refuse to follow a supreme court decision. Whatever the theoretical merit of Restatement 2d Torts § 766, we are obliged to follow Kline v. Eubanks and its progeny. We therefore affirm the rejection of LP & L's claim against Pennzoil.

II. AMOUNTS AND ITEMS OF DAMAGE
LP & L argues that the trial judge erred in the amount of his award for excess fuel costs; in his denial of damages for the cost of conversion of generators from gas-burning to oil-burning; and in the amounts of his awards for increased maintenance and operation costs caused by oil-burning.

II(a). ALTERNATE FUEL COSTS
In evaluating damages for the excess cost of alternate fuel, an essential premise is that the breached contracts are requirements contracts. United was obliged to furnish LP & L with whatever gas LP & L required at Sterlington and one third of whatever gas LP & L required at Ninemile (within specified daily maximums and, for Ninemile, an hourly maximum of one 20th of the daily maximum). This essential premise seems at times unacknowledged in the trial judge's calculation of the award *168 for excess cost of alternate fuel, apparently because obscured by the use of an indirect measurement based on the fuel adjustment clause charges made by LP & L to its area customers. As hereafter explained, the parties attempted to approximate damages for the excess cost of fuel by use of LP & L's fuel adjustment charges to its area customersan amount at least sometimes wrongly calculated by LP & L vis-á-vis its area customers, though not necessarily wrongly calculated vis-á-vis United, as the excess amount LP & L itself expended for alternate fuels.
A precise measurement of the amount of gas that would have constituted LP & L's requirements (within contract maximums), if United had not breached, and thus a precise measure of LP & L's excess cost of replacement fuel, is impossible. The principal contributor to this impossibility is LP & L's operation of its power plants in harmony with the power plants of LP & L's corporate siblings (including NOPSI, plaintiff in the consolidated case) in the integrated Middle South Utilities Company system, in a plan called economic dispatch. By economic dispatch, Middle South coordinates electricity production by its subordinate corporate electricity producers, so as to meet their combined demand at the lowest possible cost. Middle South does so by continually analyzing the costs of production and, through a central system operator at Pine Bluff, Arkansas, drawing each hour more electricity from the cheaper producers and less from the more expensive. On the basis of hourly calculations, each producer's cheapest electricity is by an accounting allocated to that producer for its own area customers; any producer's surplus of cheaper electricity is "sold" (for fuel cost alone) to sibling producers and any deficiency is made up by cheaper electricity from sibling producers. (Middle South also sells electricity to unrelated utilities, allocating the highest-cost electricity to these "off-system" sales.) Presumably, had United continued to supply LP & L with gas that would produce electricity cheaper than that of LP & L's sibling producers, LP & L would have produced more electricity with United's relatively cheap gas (within the maximums of the requirements contracts with United) than it did with the more expensive alternate fuels. There are other factors, such as the relative heat equivalencies of and the efficiencies in burning gas and oil, that are measureable. But, to repeat, there is no way to measure precisely (1) the fuel cost of the amount of electricity that would have been produced by burning United's gas had United not breached, versus (2) the fuel cost of that same amount of electricity produced by burning alternate fuels or by buying electricity from corporate siblings (also, LP & L emphasizes, at the under-true-cost price of fuel cost alone).
LP & L therefore asked the trial court to make an award, as the best available basic approximation of LP & L's damages from the excess cost of alternate fuel owing to United's failure to deliver gas in accordance with its contracts, on the basis of the increases in LP & L's area customers' billings under the "fuel adjustment clause" authorized by governmental rate-controllers. United agrees, in its reply brief, that from April 1975 through December 1981 this "was a reasonably accurate reflection of increases experienced by LP & L in the cost of fuel used to generate electric energy for LP & L's area customers." United argued, however, that LP & L's calculation of that basic approximation at $78,523,963 required adjustments, some of which the trial judge made (including those for mathematical errors) while accepting the basic approximation, thereby reducing the award to $39,810,934. LP & L complains that six of those adjustments were erroneous.
Adjustment 1: Sales to Other Utilities
In respect to the period before April 1975, the trial judge eliminated $5,129,369 excess fuel costs "incurred by LP & L in generating energy for sale to other utilities," concluding that "some of these costs would have been incurred even if United had not curtailed and are therefore not a result of United's breach of contract. LP & L has recovered [these costs] from other utilities...."
LP & L argues that United has had the benefit of under-cost replacement electricity *169 from Middle South's economic dispatch system when LP & L's siblings produced electricity more cheaply than LP & L could (especially after April 1975), and ought not be heard to complain of the burden of that system from the occasions when LP & L sold to its siblings (and others) before April 1975. We agree. We assert at the outset, as fundamental to this discussion, that LP & L's "requirements" under its contracts with United included all its needs for producing electricity, irrespective of whether sold to other utilities or to its Louisiana "area customers."
United's basic argument on this point is simply that LP & L has collected these excess fuel costs for sales to other utilities twiceonce by its fuel adjustment charges to its area customers and once by its charges to the other utilities. That is indeed the case, until April 1975. After April 1975, the Louisiana Public Service Commission no longer allowed the excess cost attributable to electricity sold to other utilities to be openly included in the fuel adjustment charges to LP & L's area customers.
That LP & L's area customers should not be charged for increased costs of fuel for LP & L's sales to other utilities (whether or not also paid by the other utilities) seems indisputable. It does not follow, however, that United's breach of LP & L's requirement contracts did not oblige United to pay for those increased costs of fuel.
The trial judge erred in, in effect, so holding. As between United and LP & L, United was obliged to supply LP & L's requirements up to contractually-specified maximums, and failed to do so. The requirements contracts did not deny LP & L the right to burn gas to produce electricity for sales to other utilities; and the charged-for replacement fuel for that purpose is not shown by United to have exceeded (equivalently) the contractual maximums, nor to have constituted by its quantity an abuse of the right to demand requirements within the contractual maximums.
We conclude that LP & L was entitled to recover as damages from United the excess costs attributable to sales to other utilities. LP & L's having charged its customers twice does not prevent it from recovering from United once.
The trial judge's finding that some of the costs before April 1975 "would have been incurred even if United had not curtailed" appears to relate to testimony of a United expert concerning electricity produced by oil-burning at Sterlington. In March 1975, of LP & L's total of 1,245,788 megawatt hours, LP & L's highest megawatt-hour cost was that for the generation by oil-burning at Sterlington. Oil-burning generated 3,668 megawatt hours that month, none of which was allocated to LP & L's area customers (who, to repeat, were allocated the cheapest electricity produced by LP & L), but all of which was included in calculating the area customers' fuel adjustment charges (as noted above). United's expert roundly reprehended LP & L (and the Louisiana Public Service Commission) for including the fuel-cost increases for sales to other utilities in its fuel adjustment charges to LP & L's area customers. One of that expert's declarations may have been the source of the trial judge's view that some costs would have been incurred even with no curtailment by United. That expert declared that LP & L's expert
"doesn't know and I don't know ..., even using his methodology, if United had delivered ... enough gas to generate another 100,000 megawatt hours, I don't know that that 3,368 megawatt hours that was generated on oil at Sterlington wouldn't have been generated. I don't know that and he doesn't know that. But he still, you know, is suing United for it."
The expert's position, related to the fact that LP & L sometimes sold large amounts to sibling utilities and off the Middle South system, was that even a surfeit of gas would not assure one-for-one replacement of megawatts generated by oil-burning (and therefore lack of gas did not cause oil-burning). The expert argued that LP & L's government-authorized fuel adjustment charge against its area customers rewarded LP & L for generating higher-cost electricity, and the higher the cost the higher *170 the reward: before April 1975, LP & L recovered, overtly and with PSC approval, twice the excess fuel cost of electricity sold to other utilities by charging both the utility and LP & L's area customers for that cost.
The material thrust of this argument by United, in the context of this action for damages for breach of contract, is that LP & L did not mitigate its damages. (That it was more profitable for LP & L not to do so is not material.) A failure to mitigate is not proven, however, by an expert's testifying "I don't know." The expert established the possibility of a profit motive for burning higher-priced oil even if a cheaper fuel were available: but United did not prove that a cheaper fuel was available. Certainly United, by its own breach, did not make a cheaper fuel available. United simply did not prove that LP & L did not mitigate its damages in this respect.
We therefore increase the award to LP & L by the $5,129,369 increased alternate fuel costs attributed to sales to other utilities.
Adjustment 2. Hourly Calculation of Damages
As noted above, LP & L submitted that its area customers' fuel adjustment clause charges were the best approximation it could make of its damages from the increased cost of alternate fuel. LP & L had originally calculated those charges each month for the purpose of adding its added costs of fuel to its customers' base-rate monthly bills.
United attacks LP & L's calculations on the basis that they are defective as a calculation of the excess alternate fuel costs for electricity for LP & L's area customers (just as United argued as to Adjustment 1, above). United asserts that its own calculations of actual excess costs chargeable to LP & L's area customers, purportedly based on Middle South's hourly economic dispatch allocations and charges, show that LP & L's monthly calculations overcharged area customers by $14,874,170 between March 1976 and February 1980. The fundamental error of United's attack is that the question is not whether LP & L overcharged its customers, and how much, by its fuel adjustment calculations, but whether LP & L was damaged, and how much, by United's admitted failure to deliver United's requirements (or part requirements) of gas as it had firmly contracted to do.
In fixing the award to LP & L for its damages, nevertheless, the trial judge accepted United's arguments concerning the inappropriateness of the fuel adjustment charges passed on by LP & L to its area customers. He therefore reduced LP & L's calculation from the amount of its fuel adjustment charges by another $14,874,170, as United requested. He agreed with United that LP & L's excess alternate fuel costs from United's breach of its obligation to supply LP & L's requirements were more accurately calculable hourly rather than monthly and that LP & L's calculation on a monthly basis failed to distinguish between fuel LP & L would have burned regardless of curtailment and fuel burned as a result of curtailment. He concluded, using United's hourly calculations, that LP & L would have incurred $14,874,170 of these costs even if United had not curtailed.
We can agree that monthly calculations are not ideal, if only because the contracts set a daily maximum delivery obligation (and, at Ninemile, an hourly maximum of a 20th of the daily maximum). LP & L was certainly not entitled to overdraw the daily maximum on peak days because it had underdrawn it on other days of a month. But we cannot agree with the trial judge's first conclusion, namely that, because economic dispatch made hourly calculations, United's hourly calculations were more accurate than LP & L's monthly ones. (We note that, as United's expert testified, hourly variations from a 24th of the contract day's electricity usage are certain to occur, between still midnight and busy midday, perhaps somewhat moderated in winter but aggravated in summer by heating and cooling usage. Daily variations from a 30th of a month's usage would appear less drastic save on weekends and days of unseasonal *171 climate. The error of monthly calculations would appear to be less than the error of hourly calculations for this reason.) Calculating hourly rather than monthly does not, in any case, explain the greater part of United's $14 million calculation.
There are three premises to United's hourly calculations that produce the difference in result from LP & L's monthly calculations and thereby the adjustment under discussion:
(1) the elimination of increased costs of electricity not allocated by Middle South's economic dispatch system to LP & L's area customers (notwithstanding that the requirements contracts included whatever gas LP & L needed for electricity);
(2) the treatment of United's contractual obligation to deliver at Ninemile "331/3% of the fuel requirements" as if it read "one half of the actual deliveries by Texaco" (which was bound by contract to supply the other two thirds of requirements, but after early 1979 did not); and
(3) the changing of a daily maximum delivery obligation (with an hourly maximum at Ninemile of one 20th thereof) into 24 hourly ones of one 24th thereof.
United's expert exemplified his calculation in the following testimony (with italicizing by this court of his premises that we deem mistaken):
"This ... illustrates the way in which you would calculate the fuel replacement costs in the event of a United curtailment when you analyze those replacement costs for each hour just as the [Middle South] system operator makes these allocations each hour, and I would like to start with ... an hour in which the calculation shows the complete replacement of the entire United curtailment. In hour 16, 4 p.m., the total load of the LP & L system, the area load [for "area customers"] of LP & L is 2,920 megawatt hours. That is equivalent to the 3,000 mwh ... that goes to Louisiana area load. When we started off at the cheapest sourcesremember the cheapest sources available to LP & L go first to serve LP & L [area customer] loadthere are 1700 mwh that are available from other gas sources. Texaco gas at Little Gypsy, Texaco gas at Ninemile 5, could be sometime LGP [Louisiana Gas Purchasing, discussed hereafter] gas is cheaper. In any event, there are 1700 mwh served by the cheaper gas.... This [number] is for purposes of illustration, although it is based on a typical hour. Now, Texaco delivers in this hour to Ninemile units 1 through 4 ... enough gas to generate 580 mwh and United delivers 70 mwh. Now, if you add that up [1700 + 580 + 70], you will see that you have got a total of 2350 mwh. You are obviously short of serving the Louisiana area load. In order to serve that load, you had to burn... the oil equivalent to 570 mwh ... [to] come up with the total [LP & L's area customers'] load of 2,920 mwh.
"We now have to determine what the alternate fuel costs were to replace the United curtailment and we do this in the same way that [LP & L's expert] did it for LP & L.

"The United obligation is one-half the delivery to Ninemile units 1 through 4 by Texaco, and obviously one-half of 580 is 290 mwh, but United, as we saw, delivered only 70 mwh of equivalent fuel. If we subtract the 70 from 290, clearly we have the need to replace 220 mwh that United was obligated to deliver. So the replaced curtailment with alternate fuels is 220 hours ... that had to be replaced by LP & L with higher cost ... fuel....
"Now, if I can direct your attention to... hour 8[,] ... an hour in which there was a United curtailment but no responsibility for alternative fuel costs.... The load in hour eight, that is 8 a.m., ... is only 1,980 mwh.... These fluctuations in hourly load are typical of the daily fluctuation in load experienced by any utility. Now, again, we find that... there is low-cost gas available sufficient to generate 1,480 mwh to serve the Louisiana area load. Also, Texaco is delivering to Ninemile 1 through 4 the equivalent of 540 mwh. We can see that we have already exceeded the Louisiana area load. 1480 plus 540 is 2,020 mwh, but the Louisiana area load is only *172 1,980 mwh, so that we already see that in this hour, 40 mwh generated by Texaco, the low-cost Texaco gas[,] is going off the LP & L system. It is equivalent, it is part of this 1,000 mwh ... going to the [Middle South] exchange.
"Clearly, given the fact that the way the energy is allocated with the cheapest energy going to the area load and the next cheapest or the next more expensive going off system, clearly if this generation by Texaco gas at $3 a mwh already is in excess of the Louisiana power area load by 40 mwh, this additional 70 [mwh from United gas] at the more expensive $7.50 is also going to serve customers outside the Louisiana area load. If United had delivered every cubic foot of gas that it was obligated to deliver in that hour, that gas would not have gone to the Louisiana load.... Every additional cubic foot that United could have delivered would have gone to serve non-Louisiana [i.e., non-LP & L area] customers.

And we can see that the United obligation is one-half of Texaco's deliveries, that is 270 mwh. [United] actually delivered 70, so if we are simply looking at curtailment, their curtailment was the equivalent of 200 mwh, but the amount of that curtailment that was replaced was actually zero because no kwh generated with United gas could have possibly gone to the Louisiana area load. Therefore, the cost of replacement is zero....
"[In] hour 11, 11 a.m., the load is ... 2,420 mwh. Of this total, 1,690 mwh of cheap gas ... is provided. Texaco delivers 580 mwh and United once again ... delivers 70 mwh, but this is still short of the Louisiana area load by 80 mwh and it is necessary for LP & L to burn oil equivalent to generation of 80 mwh in order to satisfy its area load. So, how do we calculate the cost of that curtailment.

"The United obligation once again is one half of the Texaco delivery, again half of 480 is 290 mwh. The actual deliveries by United were only 70, so United's curtailment is equivalent to 220 mwh. However, in this case, the first 80 mwh of that curtailment, had it been delivered, would have gone to serve the Louisiana area load and then ... anything in excess of that 80 mwh, that is, the additional 140 to make up the 220 curtailment, would have gone off system.... So it is only the 80 mwh that would actually have had to have been replaced [to supply LP & L' area customers] that should count as the curtailment for which there was an incurrence of alternative fuel costs passed through to Louisiana customers."

Of the three previously noted premises of United's hourly calculations, as shown by that testimony, the first and most important is its exclusion of excess fuel costs allocated by Middle South's economic dispatch to other utilities. We repeat, again, that the requirements contracts between LP & L and United do not limit LP & L's use of gas to generation of electricity for its area customers. United's hourly calculation excludes from LP & L's damages any excess alternate fuel cost for electricity allocated to other utilities (always the highest excess alternate fuel cost, because of the Middle South economic dispatch). We have rejected this exclusion in Adjustment 1 and we reject it here as well. United was obliged by its contracts to supply whatever gas (within contract maximums) LP & L required for generating electricity, whether for its area customers or for other utilities.
The second premise of United's hourly calculationthat United's delivery obligation at Ninemile was half of Texaco's actual deliveryfinds no support in the contract language. The language requires "331/3% of the fuel requirements" (not over 80,000 Mcf a day, nor over a 20th of that in any one hour). As long as Texaco was not itself curtailing deliveries of its very cheap gas (and the other third of requirements was met, including in part from United), United's contractual one-third of requirements would indeed approximate half of Texaco's actual delivery. But once Texaco itself began to curtail, that equivalency existed no longer. For example, in United's *173 expert's "hour 8," for the "Louisiana area load" alone, Ninemile units 1 to 4 generated 1,980 mwh. The minimum "requirement," therefore, was fuel sufficient to generate 1,980 mwh. Texaco's 2/3 of that requirement would have been gas for 1,320 mwh (and United's 1/3 would have been gas for 660 mwh). Texaco was curtailing, however, and actually delivered gas for only 580 mwh instead of 1,320. United's "hourly calculation" calculates that United owed only half of the 580 mwh of fuel that Texaco delivered, rather than half of Texaco's contractual obligation of 2/3, which was 1,320 for the Louisiana area customers alone (ignoring other utilities, and ignoring that "requirements" might have been greater if Texaco gas could be burned instead of more expensive fuels). United's hourly calculation reduces United's clear contract obligation of (at least) 660 mwh of fuel to only 290 mwh of fuel. United's expert was clearly wrong in calculating damages on the basis that United owed no greater gas delivery at Ninemile than half of Texaco's actual delivery.
In respect to the third premise, we repeat that the contracts provided daily maximum delivery obligations (with the only hourly maximum being, at Ninemile, a 20th of a day's maximum). The significance of an hourly calculation itself, essentially, is that if in any hour LP & L's alternate fuel costs (including any cheaper-cost electricity produced by Middle South siblings) did not exceed what United's gas would have cost, not only is United's breach treated as causing LP & L no damage (as in the example's "hour 8") but, in addition, one 24th of United's delivery obligation for that day is treated as discharged. The latter treatment is unjustified under the terms of the contracts, which state daily maximum delivery obligations (or, at Ninemile, an hourly maximum of a 20th of a day's maximum), rather than an hourly maximum of a 24th of a day's maximum. The contracts did oblige LP & L to take gas "in equal daily and hourly quantities as nearly as operating conditions will permit," but that contract wording recognizes that demands for electricity do vary among the hours of a day (e.g., between a summer midnight, when sleeping homeowners and closed businesses use less airconditioning and other machinery, and a summer midafternoon, when airconditioning demands the most electricity and other machinery is more likely to be in use). The contracts only obliged LP & L to take gas at a uniform rate as operating conditions would permit, and United's hourly calculation errs in dividing its daily delivery obligation into 24 uniform hourly delivery obligations.
We summarize our conclusions on the "hourly calculations" adjustment: LP & L's monthly fuel adjustment clause charges to its area customers are not ideally precise calculations of the excess fuel costs portion of LP & L's damages, because monthly calculations would not account for any fuel usage in excess of the contracts' daily maximums (much less usage in any one hour in excess of a 20th of the daily maximum). United's hourly calculations, on the other hand, are entirely unacceptable because they limit "requirements" to requirements for area customers, they limit United's Ninemile delivery obligation to half of actual deliveries by Texaco during Texaco's curtailment, and they change daily maximums into 24 hourly maximums of one 24th of the daily maximum.
Our final conclusion on this point is that United's hourly calculations must be rejected and LP & L's monthly calculations accepted. LP & L's calculations reasonably approximate LP & L's damages from excess costs of alternate fuel purchases. The errors LP & L's monthly calculations may contain as a summarizing of total excess alternate fuel costs chargeable to its area customers are not errors in summarizing LP & L's damages from the costs it had to pay. The charges to LP & L's area customers did not, after April 1975, include all excess costs of alternate fuels for electricity sold to other utilities although United's requirements contracts obligation included gas for that electricity, and therefore LP & L's basic approximation itself understates, to that extent, its damages. All factors considered, we conclude that LP & L's basic approximation should not be reduced by *174 United's hourly calculations. We therefore increase the award to LP & L by $14,874,170.
Adjustment 3. Ninemile "Requirements" After Texaco Curtailed
The trial judge rejected LP & L's claim, to the extent of $10,819,212, of alleged excess costs of alternate fuel (including electricity generated elsewhere) to replace gas that United was obliged to but did not deliver to Ninemile units 1 through 4 after Texaco began to curtail its Ninemile deliveries in early 1979. The trial judge accepted United's position that its third-of-requirements delivery obligation at Ninemile was only one third of the fuel actually used during the period when both United and Texaco (together obliged to supply all requirements of those Ninemile units) were curtailing their deliveries. The trial judge points out that LP & L's hypothetical requirements for 1979, 1980 and 1981 are substantially greater than actual usage in 1977 and 1978, when Texaco was not curtailing.
LP & L argues that actual use is not a measure of fuel "requirements" under the circumstances. Again, Middle South's economic dispatch system plays a role: to the extent that burning higher-priced alternate fuels available at Ninemile produced electricity at a higher cost than that of a sibling utility or even of another LP & L plant, the system operator would not draw electricity from Ninemile. LP & L argues that, if Texaco had continued to deliver its Ninemile obligation, the Middle South system operator would have drawn very much more electricity from Ninemile, causing Ninemile to take a large measure of the Texaco contract maximums, because Texaco gas generated electricity from two to several times cheaper than other electricity generated by LP & L and its Middle South siblings with other fuels. (See, e.g., United's hourly calculation example, with Texaco gas costing $3 per mwh produced, United gas $7.50 and oil, always very high priced, $16. In 1979 to 1981, oil increased to $23 to $41.) A United expert agreed that LP & L's calculations of the amounts Texaco would have been called on to deliver, notwithstanding less usage in 1977 and 1978, were "pretty close to what the actuality might have been had they operated" (although that expert would have used hourly calculations, as earlier described, instead of LP & L's monthly ones).
LP & L's calculation of this part of its fuel damage claim takes into consideration one half of the Texaco contract maximum (rather than, simply, the United contract maximum) because the Texaco maximum was relatively smaller than the United maximum and in practical effect also limited the United maximum. United's third had a daily maximum of 80,000 Mcf; Texaco's two-thirds had a daily equivalent maximum of only 142,000 Mcf. If the much cheaper Texaco gas had been available and LP & L had taken the 142,000 Mcf maximum as Texaco's two thirds, it could only have demanded half of that, or 71,000 Mcf, as United's one third, of LP & L's requirements for Ninemile 1 through 4. LP & L would presumably not have been able to demand the other 9,000 Mcf of the United's 80,000 contract maximum (because United was only obliged to deliver a third of requirements) unless LP & L were able to acquire an additional 18,000 Mcf equivalent atop Texaco's fixed-price maximum of 142,000. Thus the relatively lower Texaco maximums constituted, in times of high fuel costs, a practical maximum on United's obligations as well.
The ultimate question on this point is whether requirements are measured by what LP & L would have used in the absence of United's and Texaco's breaches, or by what LP & L did use in the presence of those breaches. One United expert observed:
"It seemed to me that the fuel adjustment clause as it was applied was inappropriate... that there were a number of questions still unresolved; for example,... the calculation for the period in which Texaco was in curtailment based on the fuel burn. Now we thought it was unfair to introduce this extraneous consideration.... But... that is a legal issue to be resolved and if you resolve the issue one way, you get one kind of *175 calculation. If you resolve it another way, you get another kind of result."
It was the trial judge's function to resolve that legal issue, of whether LP & L's damages are limited to excess costs of replacement fuel actually burned at the Ninemile units, or whether, to the contrary, damages may be recovered for the excess cost to replace fuel that LP & L shows, more probably than not, it would have required were there no breach.
We conclude that the proof does establish, as more probable than not, that if Texaco had not curtailed, Ninemile would have burned (and therefore required) a very large part of the Texaco maximums, as LP & L reasonably calculated because neither LP & L nor its siblings could generate all of the electricity they required by burning other available fuels as cheaply as by burning Texaco gas. LP & L would equally have required, therefore, half of that Texaco quantity from United as United's third of requirements (well within contract maximums), to produce the electricity that LP & L would have produced at Ninemile for its own area customers and for its siblings. We add that this is not a claim for hypothetical lost profits but for actual losses. The electricity that the missing Texaco and United gas would have generated was in fact generated. Alternate fuels to produce that electricity were in fact burned, although at other generating units because fuel costs there were cheaper than those of Ninemile (resulting in a mitigation of LP & L's damages). This excess fuel cost damage to LP & L was real.
We therefore add to LP & L's award this $10,819,212.
Adjustment 4. Test Energy at Waterford
LP & L argues that the trial judge erred in deducting, from LP & L's basic approximation of total excess alternate fuel costs from United's breach, the excess alternate fuel cost of $1,522,137 for fuel burned at LP & L's plant at Waterford to test its new generators. This argument is related to a part of the argument on Adjustment 3, that electricity not produced at Ninemile because of United's and Texaco's breaches had to be produced elsewhere to fill Ninemile's "requirements." Throughout the several adjustments to its excess fuel cost calculations, LP & L consistently argues that it has done the best it could to approximate its increased fuel costs by totalling those passed on to its area customers; and that this best-available approximation which does not include in full all excess costs of fuel for electricity sold to other utilitiesis not subject to individual adjustments because it is only an approximation. We have agreed with this point of view as to some of the adjustments, but we are unable to do so as to this one.
With United in default, certainly Ninemile's or Sterlington's "requirements" could have been made up in part by purchasing electricity from Waterford (as from other generators), in which case LP & L would recover, in effect, the excess cost of Waterford fuel. The Waterford test electricity did indeed flow to LP & L's area customers or other purchasers, and in that sense helped to meet what might otherwise have been requirements of Ninemile and Sterlington.
If United had not defaulted, however, Waterford testing would still have occurred, using fuel at then-market price. (The fuel would not have been United's low-priced gas, because the contracts for Sterlington and Ninemile requirements did not entitle LP & L to gas for use elsewhere.)
Accordingly, whether United had defaulted or not, Waterford would have had the same excess cost of test fuel, notwithstanding that Waterford test electricity flowed to LP & L's purchasers and therefore reduced LP & L's other "requirements." It therefore cannot fairly be said that United's breach caused the excess cost of fuel for testing at Waterford. Nor is United unjustly enriched by escaping responsibility for that part of its requirements obligation, for United did not owe requirements for Waterford testing.
We affirm the trial judge's elimination of this $1,522,137 excess cost of fuel from LP & L's calculation and award.
*176 Adjustment 5. Louisiana Gas Purchasing Corporation Gas
The trial judge reduced LP & L's award by $4,987,006 because of LP & L's contract with its sibling utilities regarding a gas supply for Sterlington that LP & L acquired in August 1971. LP & L at that time entered a 20-year, fixed-price contract with Louisiana Gas Purchasing Corporation (at about twice the cost of United's contract pricethough still cheaper than much replacement fueland at the further cost of laying a pipeline and agreeing to "take-or-pay" provisions). LP & L contracted with its siblings that they would take both burden and benefit of 65% of the electricity to be generated by LP & L's burning this gas at Sterlington: LP & L agreed to "sell" (and they always to "buy") 65% of the electricity generated with this gas. This electricity might be cheaper or dearer, from time to time, than other Sterlington generation. It would, therefore, under ordinary economic dispatch practice, have been allocated to LP & L's area customers when cheaper but to the sibling utilities when dearer. The trial judge treated this action, in effect, as a failure to mitigate damages properly because, as it turned out, this gas was cheaper over the years than other available fuels.
In our view, the critical fact is that LP & L did not give up this gas, did not give up a substantial supply of a replacement fuel that was cheaper than most other replacement fuels. LP & L burned all of this gas, at Sterlington. It also burned other, more expensive alternate fuels, to meet its requirements at Sterlington. Its fuel requirements, we repeat once again, were not limited to fuel to generate electricity for its own "area customers" but included fuel for whatever electricity it generated for whatever customers (subject to contract maximums). And, to the extent that its requirements might from time to time have exceeded contract maximums, United was not entitled to have the benefit of the cheapest fuel that LP & L used in any event.
We add that LP & L's obligation to mitigate damages did not oblige it to invest in the substantial cost of a pipeline to bring the LGPC gas to Sterlington, nor to take the risk that later market conditions would leave it with a 20-year supply of higher-priced gas that it was obliged to take or pay for in increasing quantities. See Unverzagt v. Young Builders, Inc., 252 La. 1091, 215 So.2d 823 (1968).
We therefore increase the award to LP & L by this $4,987,006.
Adjustment 6. Sterlington Damages after 1974
LP & L argues that a $225,000 reduction made by the trial judge is a partial duplication of the "hourly calculation" adjustment. LP & L asks correction only if we do not reject the hourly calculation. Because we did reject that calculation, this argument becomes moot.

II(b). CONVERSION COSTS
There is an inconsistency in awarding as damages the excess cost of oil burned as replacement fuel, and the increased maintenance and operating costs from using oil, while denying any recovery whatsoever for the cost of equipment to burn the oil. The trial judge awarded no damages for the $17,757,645 that LP & L spent in converting some generators at Ninemile and Sterlington to burn oil. There are difficulties in fixing an award, but it indeed appears that United's breach caused at least part of these damages at both Sterlington and Ninemile.
Sterlington
The 1956 Sterlington contract obliged United to provide, from 1958 to 1978, LP & L requirements for unit 5 and the "proposed new Unit No. 6," up to 50,000 Mcf a day. A contract mechanism provided for increasing the daily maximum and it was increased, in 1966, to 55,000 Mcf, and a 1967 "standby" contract gave LP & L another firm 16,000 Mcf, for a total maximum of 71,000 Mcf. The maximum was then reduced, however, to 30,000 Mcf for 1970 and 25,000 thereafter, by agreements on both contracts in 1969, when LP & L believed it could get cheaper gas elsewhere. As it turned out, LP & L could not get the other gas. The consequence was that LP & L was entitled to only 25,000 Mcf after *177 1970 instead of the 71,000 it had had under contract since 1967.
That reduced maximum, even at the 1970 level of 30,000 Mcf, was inadequate for the generating capacity of Sterlington. Atop that inadequacy came notification from United of potential peakday shortages and other gas supply problems in the future.
The Sterlington boilers (unlike those of Ninemile) were not capable of burning oil even for a few days at a time. LP & L therefore decided, in Summer 1970 (before actual curtailment by United began in Fall 1970), to provide a part-time oil-burning capability. This "Phase I" conversion was completed in 1971 at a cost of $2,238,268.
The evidence supports the trial judge's inference that this Phase I conversion (notwithstanding incidental usage during United's curtailment) was required by LP & L's having only a 25,000 Mcf daily gas supply, rather than by the danger of curtailment of even that 25,000 Mcf. We cannot say that the trial judge was wrong in rejecting this item of LP & L's damage claim.
United began curtailing in late 1970. Sterlington 6 was thereafter converted to full-time oil-burning capability in 1974 to mid-1976, at a cost of $2,481,409. The trial judge reasoned:
"Even if United had not been in curtailment, the maximum deliveries by United under the Sterlington contract plus that available from other suppliers would not have been adequate for the Sterlington station in the 1970's. The Phase II conversion would have been necessary in any event."
We agree that this conversion would have been necessary in any event, but it would not have been necessary until two years later. Even if we were to award to LP & L nothing but interest on the costs expended in 1974-1976 that could have been postponed until 1976-1978 (ignoring that some part of the useful life of the oil burners was expended), two years at 12% would amount to 24% of the total cost.
The trial judge's ruling, moreover, has the effect of giving United credit for LP & L's cheapest means of generating substitute heat. United was entitled to have LP & L mitigate its damages by burning other fuel, but not by counting as United's substitute any gas that LP & L was able to acquire, nor even the oil that LP & L was able to use with unit 5's part-time oil-burning capacity (the cost of which, the trial judge held and we affirmed above, was LP & L's sole responsibility). The most expensive substitute heat, by a correct accounting, was that that came from the full-time oil-burning by unit 6, because the true full cost of that heat inescapably includes some cost of the burning device supplied by the Phase II conversion. United's breach was a cause of the Phase II conversion at Sterlington, and some part of the cost of that conversion is part of the damage from that breach.
To award to LP & L the full cost of a permanent conversion in 1974-1976, with a life expectancy of perhaps 25 years, would unjustly enrich LP & L, for United's breach only endured until the end of its contract in 1978. Indeed, United's expert testified that it would have been unreasonable to expend the cost of conversion if oil were to be burned for only two years or so. Evidence that gas again became available and used as Sterlington's fuel in the 1980s supports LP & L's argument, however, that it has not had and will not have the benefit of the oil-burning capacity of unit 6 for its useful life, and therefore should not have to pay for the full post-contract part of that life. There is also merit in LP & L's argument that United's breach at least caused LP & L to expend the cost of conversion (to the extent needed because of contract expiration) before it would otherwise have had to do so.
Thus to award none of this cost would be error; yet to award all is equally sure to be wrong. We are left with the necessity to make an apportionment. We consider that, after the United contract expired in 1978, LP & L had need for oil-burning, and that LP & L's need after contract expiration endured for much over half of the total time that the conversion fulfilled such a need, that is, over half of the actually used life of the equipment. On the other *178 hand, LP & L had to pay for that need at least two years early. We deem it a reasonable apportionment of this Phase II cost to charge a third to United and two thirds to LP & L. We therefore increase LP & L's award by a third of this $2,481,409, or $827,136.
Ninemile
The 1968 Ninemile contracts with United and Texaco promised a 25-year firm supply of gas requirements for units 1 through 4 (although prices were negotiable for the last five years). United curtailed its deliveries from late 1970. Texaco did not curtail until 1979. Ninemile units 1 through 3, previously capable of part-time oil burning (four to five days at a time), were converted to full-time oil-burning capability between 1973 and 1977.
The trial judge reasoned:
"As pointed out by the Court in its discussion of Phase I and Phase II conversion of Sterlington Unit 6, the conversion of Ninemile Units 1-3 would have been necessary in any event. Furthermore, the Court is of the opinion that this conversion process was not within the contemplation of the parties at the time of the confection of the contract, or considered as a possible element of damages even if the contract was breached."
The Sterlington reasoning is not applicable to Ninemile. Sterlington had very inadequate daily maximums of gas under contract (reduced to 25,000 Mcf from 71,000) when United curtailed, and the contract was to expire in less than eight years. Ninemile, on the other hand, had contracts for its full requirements (with unreduced delivery maximums), under contracts that provided fixable prices through 1987 and negotiable prices through 1992.
The trial judge's ruling that conversion of Ninemile "would have been necessary in any event" may refer to the fact that Texaco's 1979 breach would have required it, or may be an acceptance of United's argument that federal orders would have prevented United's fulfilling its contractual obligations. In either case, we disagree. Texaco's 1979 breach did not cause a 1974 conversion. And we have already noted, and agreed with, the trial judge's rejection of United's federal orders defense, and we again reject that defense as embodied in the argument that conversion of Ninemile would have been necessary even if United had not curtailed. The necessity of conversion of some part of Ninemile's plant resulted from United's overall breach, just as the federal orders did. The ruling that conversion would have been necessary if United had not breached is clearly wrong.
Also wrong is the ruling that conversion from gas to oil was unforeseeable as a consequence of nondelivery of gas by United. United well understood that its contract was to supply fuel to provide heat for boilers to provide steam to drive generators. As a matter of law, United had to foresee that, if it breached, LP & L would have to burn fuel from other sources for that purpose. As pointed out in treating United's appeal's "other damages" argument, above, the traditional doctrine is that unforeseeability relates to the cause and not the cost of the damages. It was patently foreseeable that, to operate the Ninemile boilers, some equivalent quantity of fuelgas, oil or coalwould have to be burned. Equally evident was that conversion would be necessary to burn oil or coal. United was entitled to have Ninemile produce the heat for its boilers by the cheapest means available, but United was not entitled to have Ninemile cease operations. Conversion of some Ninemile units to oil-burning capability was, it is not disputed, the cheapest means available.
United is obliged to pay for the conversion of Ninemile 1 through 3, for that conversion was made necessary by United's breach alone, years before Texaco breached. We therefore amend the award to LP & L to include the $13,037,968 cost of the Ninemile conversion.

II(c). INCREASED OPERATION AND MAINTENANCE COSTS
As we noted in treating United's appeal, a United expert conceded that operating and maintenance costs are higher for generators fueled by oil than for those *179 fueled by gas. We earlier upheld the trial judge's conclusion that United was liable for the increased costs of maintenance and operation, at least in the amounts that United's proposed findings of fact had provided.
The evidence on both items consists of an LP & L expert's factual and expert testimony and calculations and the attack thereon by a United expert.
Operation
LP & L calculated its added costs of operation from the salaries that it paid to specified operators during the breach, multiplied by 1.5 to include LP & L's overhead factor. That calculation produced the claim of $1,648,841.
United's expert expected such documentation as staffing plans and job descriptions to justify the need for the additional operators. He also contended that LP & L was, to some amount indeterminable without full documentation, claiming a partial double recovery on this item, because LP & L also indirectly charged, as a fuel cost, some of the salaries of these operators who worked on the adjacent fuel storage facility for a related corporation (System Fuels Incorporated) that sold oil to LP & L. His strongest attack pointed out that there were extended periods of months and, literally, years in which no oil was burned in each of Ninemile units 1 to 3 and Sterlington 6; and that, as LP & L's witness had testified, the additional operators worked in other areas of the plant when not occupied in oil handling or oil storage.
We cannot say that the trial judge erred in rejecting the $1,648,841 claimed by LP & L and in awarding, instead, the $289,676 proposed by United.
Maintenance
LP & L claims $5,005,800, but the trial judge awarded only $208,532, as additional maintenance costs resulting from the use of oil as a fuel.
The same expert whose testimony was accepted by the trial judge to reduce the operating expense claim gave similar testimony regarding the maintenance claim.
LP & L's witness prepared total actual maintenance costs and estimated what costs would have been if only gas had been burned. The difference between the two is the amount of LP & L's claim. LP & L did not keep records of individual generator unit maintenance costs. The actual costs were for all units at a plant, e.g., at Ninemile, for units 1 through 5, although only units 1 through 3 ever burned oil. United's expert again attacked both lack of documentation and the calculation method of this claim. Specifically, he objected to estimating the gas-only cost on the basis of the average of 1971 through 1974, with no correction for inflation. He showed that correction for inflation would have sharply reduced the difference between the actual maintenance costs and the corrected estimated costs.
We are again unable to conclude that the trial judge erred in accepting United's expert's testimony and the damage amount of $208,532 as proposed by United rather than the $5,005,800 claimed by LP & L.

III. DEPOSITING AWARD WITH COURT
The Louisiana Public Service Commission, before 1975, authorized LP & L to bill LP & L's area customers an additional charge named a fuel cost adjustment, for the excess costs of fuel that LP & L burned to generate electricity not only for its area customers but for other utilities as well. Perhaps the trial judge felt strongly that the area customers might suffer a comparable inequity in respect to LP & L's recovery of those charges to the area customers in this case, if that recovery were left to the PSC to allocate (although its membership has changed meanwhile and that method had been changed by it in 1975). Perhaps for that reason, although no party requested it, the trial judge ordered the award deposited with the court for further proceedings by LP & L and the commission.
We agree with LP & L and the commission that the disposition of the award is a matter for the commission to decide. La. Const. art. 4 § 21(B) places regulatory power *180 over utilities in the commission. This power includes ratemaking. R.S. 45:1163. Ratemaking includes fixing refunds. Louisiana Power & Light Co. v. Louisiana Public Service Com'n, 377 So.2d 1023 (La. 1979). Because there is no action in this case by the class of LP & L ratepayers, it is not governed by City of New Orleans v. United Gas Pipe Line Co., 438 So.2d 264 (La.App. 4 Cir.1983), cert. denied 442 So.2d 463 (La.1983), suggesting that a class's recovery may be deposited into court and holding that a regulatory commission may not intervene in the class action.

NOPSI'S AND THE CLASS'S APPEAL
NOPSI and the class of its electric ratepayers seek, atop the trial court's award of $44,403,106, $8,031,276 costs of conversion of generators to oil-burning and $34,457,304 and $6,728,180 for lost profits on hypothesized sales to other utilities and to its area customers. The class's request for judgment in tort against United is rejected on the grounds LP & L's was.

I. CONVERSION COSTS
NOPSI's contract with United was scheduled to expire on June 1, 1975. The trial judge correctly ruled that NOPSI's management planned conversion of its generating units to oil-burning capability. NOPSI knew, from United's peak-day problems in the winter of 1969-1970 and other indications, that NOPSI might not be able to get gas and might have to burn oil after June 1, 1975. NOPSI had therefore begun preliminary planning and long-range budgeting for conversion to oil. United emphasizes that this occurred before United began curtailing.
As in the case of Sterlington's Phase II, however, the conversion had to be done earlier than otherwise necessary, because of United's breach. The conversion of Paterson station and Michoud unit 2 was completed in December 1972, that of Michoud 3 by March 1973, and that of Michoud 1 by April 1973. Thus, again, these conversions were completed over two years earlier than necessary for readiness for July 1975.
NOPSI ultimately converted seven gas units from part-time to full-time oil-burning capability. It did not finish this conversion before its United contract expired, but part of the conversion that was completed was used (together with the pre-existing part-time oil capacity) to generate electricity that would otherwise have been generated by United's gas. NOPSI seeks all conversion costs that were expended up until the June 1, 1975 expiration of its United contract.
The ratepayers note that, of the power NOPSI generated from January 1973 through the May 1975 expiration of the contract, 35% was generated with oil. They argue that this generation, replacing generation that United gas should have fueled, would not have been possible had NOPSI not converted. This argument is not wholly persuasive, because NOPSI had part-time oil-burning capability prior to the conversion, and the noted 35% of power was not generated by burning oil exclusively in the new, full-time burners. The ratepayers also assert that, had United not curtailed, utility regulation principles would not have allowed NOPSI to include, as a "used and useful" capital investment for rate purposes, the $8 million spent before the United contract expired.
We conclude, as we did with LP & L's Sterlington Phase II conversion cost, that certainly it would be wrong to assign to United 100% of NOPSI's conversion cost but, equally certainly, it would also be wrong to assign to United 0% of that cost. The useful and necessary life of the NOPSI conversion falls far less within than without the life of the breached United contract. Moreover, the basic division of costs on the basis of the June 1, 1975 date of expenditure does not adequately identify the costs of the conversion whose earlier completion can be deemed caused by United's breach. We deem it reasonable and faircertainly more correct than either 100% or 0%to assign to United 25% of only those costs expended within the period of United's breach.
Of the total conversion costs of $14,481,168, those before the contract expired were *181 $8,031,276. Of that amount we award NOPSI $2,007,819.

II. LOST PROFITS
On Sales to Off-System Utilities
NOPSI's claim for the loss of $34,457,304 profit that it would have made by selling cheap electricity to other utilities outside the Middle South system was rejected by the trial judge on the grounds that the economic dispatch practice would not have allowed it and that it was beyond the contemplation of the parties at the time of the contract. NOPSI argues persuasively that its applicable written contracts with Middle South did not prevent sales to off-system utilities. NOPSI also argues that its requirements contract with United contemplated whatever gas NOPSI required to generate electricity. We agree with the first argument but we must temper the second.
La.C.C. 1901's requirement that contracts be performed "with good faith" applies to both parties. NOPSI and LP & L condemned United for its bad faith in its dealings. They contend that United (and Pennzoil) deliberately set out to create a gas shortage in order both to create a market, specifically in power plants, for higher-priced fuel oil and to increase the market price of natural gas. There is much record support for that contention. Were that established, United might be estopped from arguing its own fault and its high-price consequences as a defense to a demand by NOPSI for maximum contract requirements. The trial judge explicitly found, however, that United was not in bad faith in its actions and, whether or not that might have been our own inference, we cannot say that that inference is so unsupported by the record as to be clearly wrong. "[W]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
But, to repeat, NOPSI was also bound to good faith dealing, in the exercise of its contractual right to its requirements. Our conclusion is that NOPSI was not entitled to demand anything more than its normal requirements, including increase in demand by area customers old and new, and perhaps, to the extent of NOPSI's usual participation, including similar increase in sibling utilities' area customers' demand. NOPSI was entitled to all of its customary requirements (within specified limits), including requirements not only for sales to its customers within its geographical area but also for its historical practice of sales to siblings and through the Middle South exchange to off-system utilities. But it was clearly not entitled to sell to other utilities its contract rights to cheap United gas. We conclude that it is equally not entitled in effect to do so by converting the gas into electricity for unprecedented direct sales outside the Middle South system.
The question is whether, when fuel costs skyrocketed, the "requirements" contract entitled NOPSI to the full limit of the specified maximums of United's cheap gas and therefore to the profits that NOPSI could have made with that cheap gas.
United points out that the quantities on which NOPSI calculates its claim could only be generated if NOPSI ran its generators at a capacity factor of over 81% (which, United also argues, would have burned more gas than the contract's maximum daily delivery obligations). United does not show physical impossibility of operating year-round at 81% of capacity, but it does make NOPSI's claim somewhat doubtful. A theoretical capacity factor of 100% would require all generators to run at top capacity every minute of the year, with no stops for maintenance or repair. NOPSI's capacity factors before curtailment rarely exceeded 50% and never exceeded 58%. Thus NOPSI's claim is based on sales that would increase generation by perhaps half or more. (An increase from 50% to 80% of capacity would be 60% of the original 50%).
C.A. Andrews C. Co. v. Board of Directors of Public Schools, 151 La. 695, 92 *182 So. 303 (1922), considered the problem of a buyer's demands for unprecedented "requirements." In that case, the school board in May 1916 invited bids for a year's supply of each of anthracite and bituminous coal, estimating annual consumption at 500 tons of anthracite and 1,000 tons of bituminous, but reserving the right to order more or less depending on "actual requirements." Plaintiff successfully bid to supply the bituminous coal at $3.75 a ton. Thereafter, the school board abandoned anthracite as a fuel. The market price of bituminous increased to $6 a ton by Fall 1916. Because consumption was double what it expected, plaintiff notified the board that it would not deliver beyond 1,200 tons at the contract price. The suit was for the excess of market over contract price, on the coal delivered in excess of 1,200 tons. Reversing a trial court judgment refusing recovery, the supreme court reasoned:
"If the board had continued the use of both kinds of coal ... the plaintiff would not have been required to deliver more than 1,200 tons under its contract. That amount was the `average annual consumption'... and would have sufficed to meet the `actual requirements....'
"[The use of both coals] must be regarded therefore as having been taken into consideration at the time of the contract, and ... the plaintiff in ... obligating itself to deliver `all the coal required by the public schools' did not contemplate, and had no reason to anticipate that the school board would thereafter change the method of heating the schools, and that it (plaintiff) would be called upon under its contract to make delivery, by reason of the substitution of all bituminous for anthracite coal.... If, as a matter of fact, the increased consumption had been due to weather conditions, or to the enlargement or expansion of school buildings, or to increased school attendance, then clearly the plaintiff would have been required to make deliveries to meet such conditions. The increment of coal would have come within the meaning of the term, `actual requirements....' But that is not the case. The increased requirement was not the result of any of the conditions named, nor due to any cause within the contemplation of the parties at the time of the contract, but was brought about by the action of the school board in discontinuing the use of [anthracite].
"Our conclusion is that the school board was not at liberty to arbitrarily change the conditions prevailing at the time of the contract ... and to thereby impose upon the plaintiff the obligation of delivering the additional coal required on account of such changed conditions."
Notwithstanding the presence in the United contract of specified limits upon NOPSI's "requirements," we conclude that the contract intended no more than to supply NOPSI's customary usages. Customary usages allow some unusual increases, as, for example, if an unusual increase were required because a giant industry using great quantities of electricity were to locate within NOPSI's area. NOPSI's "requirements" would include gas to produce electricity for that new consumer. The specified contractual limits on requirements are not intended, however, to make the term requirements superfluous, or to displace the ordinary understanding of the term, as set forth in Andrews. The limits are intended, instead, to protect against an increase still within "requirements" but not provided for by ordinary capacity or ordinary planning (as in our hypothetical case of a giant industry's moving into NOPSI's area).
NOPSI's claim for lost profits on sales to off-system utilities is not within requirements because not within the normal growth of the demands of its regular consumers (including other utilities). NOPSI's claim is that, with all utilities obliged to pay extremely high fuel costs, it could have made a theoretical windfall by selling cheap electricity. One who owes requirements does not owe a windfall. The trial judge correctly rejected this claim.
On Sales to Area Customers
NOPSI charged a base rate authorized by the governmental rate-fixing agency, *183 and included in that base rate was NOPSI's profit. NOPSI added to the base rate, by the fuel adjustment clause, the increased cost of fuel, upon which it made no profit. The result was a sharply higher total price of electricity. NOPSI contends that, because of the higher price, its customers bought less electricity than they would have, and that NOPSI lost profit of $6,390,892 on the difference between actual sales during United's breach and the sales that NOPSI had projected. NOPSI did present some evidence (including testimony by some New Orleanians of their own reduction in use because of higher prices) that higher prices would reduce consumption of electricity. And, indeed, some (but, United insists, not all) classes of consumers did decrease usage. NOPSI therefore claims $6,390,892 as an item of damage expressly within La.C.C. 1934's measure of damage as, in part, "the profits of which [one] has been deprived."
The trial judge rejected this claim, citing uncertainty in NOPSI's projections of anticipated increase in sales, and also citing energy conservation campaigns and an economic recession after the Arab oil embargo, both of which presumably decreased consumption of electricity.
Our strong suspicion that, as some individuals testified, high prices reduced consumption does not amount to a conviction that the trial judge was clearly wrong in rejecting this claim. We are unable to fix with certainty even any portion of the projected loss as more probable than not. We therefore affirm the trial judge's disallowance of this item.

DECREE
The judgment in favor of Louisiana Power and Light Company against United Gas Pipe Line Company is affirmed but its quantum is increased by $49,674,861 to $89,984,003 with pre-judgment legal interest upon the several items of damage at the rates and from the times provided in the body of this opinion, and the judgment's provision for deposit into the court is deleted.
The judgment in favor of New Orleans Public Service, Inc. and the class of its ratepayers against United Gas Pipe Line Company is affirmed but its quantum is increased by $2,007,819 to $46,410,925, with pre-judgment legal interest as provided for LP & L.
United is to pay all of its own costs and 85% of LP & L's costs and 90% of NOPSI's (and the class's) costs. Other parties are to pay their own costs.